Griffith, Appellant, *v.* United Air Lines, Inc.

2

Argued April 28, 1964.   Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

4

*Lee S. Kreindler,* of the New York Bar, with him *Alvin S. Ackerman,* and *Jerrold V. Moss,* for appellant.

*Owen B. Rhoads,* with him *George J. Miller* and *Arthur W. Leibold, Jr.,* for appellee.

*Seymour I. Toll,* with him *Charles A. Lord, T. E. Byrne, Jr., John R. McConnell, Ralph Earle, II, Abraham E. Freedman, Milton M. Borowsky, Morris S. Finkel,* and *Richter, Lord, Toll & Cavanaugh,* and *Krusen, Evans and Byrne,* and *Morgan, Lewis & Bockius,* and *Freedman, Landy and Lorry,* for amici curiae.

*J. Grant McCabe, III,* and *Rawle & Henderson,* for amicus curiae.

OPINION BY MR. JUSTICE ROBERTS, October 14, 1964:

George H. Hambrecht, a Pennsylvania domiciliary, purchased a ticket from United Airlines, Inc. [United] in Philadelphia for a flight from Philadelphia to Phoenix, Arizona, and return. On July 11, 1961, he boarded a United DC-8 bound for Phoenix. In the course of landing at Denver, Colorado, a scheduled stop, the plane crashed, causing Mr. Hambrecht's immediate death.

United is a Delaware corporation with its principal place of business in Chicago. It regularly does business and maintains operational facilities in Pennsylvania.

Decedent's will was probated in Pennsylvania. In July, 1962, the executor of the Hambrecht estate com-

menced an action in assumpsit against United and certain of its employees in the Court of Common Pleas No. 6 of Philadelphia County.[1] The complaint alleged, in substance, that United had contracted to transport safely plaintiff's decedent from Philadelphia to Phoenix and return; that in breach of this contract, certain of United's named employees, in the course of their employment, had negligently operated, managed, maintained, inspected and controlled the airplane, from which negligence the crash and death resulted; that the action was brought pursuant to the Pennsylvania Survival Act (contained in the Fiduciaries Act) of April 18, 1949, P. L. 512, §603, 20 P.S. §320.603; that as a result of said breach, decedent and his estate have suffered substantial damages including loss of accumulations of prospective earnings of the deceased.

United and the individual defendants filed preliminary objections in the nature of a demurrer, in which they asserted that the complaint alleged a breach of warranty without alleging a valid basis therefor, that the complaint failed to allege any contractual relationship between the decedent and the individual defendants, and that although the complaint alleged crash and death in Colorado, the action was brought under the Pennsylvania survival statute.

The court of common pleas sustained the cause of action as having been brought under a valid contract of carriage but dismissed as to the individual defendants. However, the court held that the law of the place of the injury, Colorado, not the law of the forum, Pennsylvania, controlled on the matter of damages, and granted leave to amend. No amendment having

---

[1] An action in trespass for wrongful death was begun at the same time. However, that action is not now before us.

been filed, the complaint was dismissed. Plaintiff appealed from the dismissal as to United.[2]

## I.

Preliminarily, it is necessary to determine whether the order directing plaintiff to amend is appealable. We have previously held that "an order sustaining preliminary objections to a complaint is definitive, and therefore appealable, where it so restricts the pleader in respect of further amendments as, virtually, to put him out of court on the cause of action which he seeks to litigate: [citing case]." *Sullivan v. Philadelphia,* 378 Pa. 648, 649, 107 A. 2d 854, 855 (1954). The order of the court below does so limit the scope of possible recovery that plaintiff cannot successfully amend. Therefore, we are satisfied that the appeal is properly brought.

## II.

The crux of this litigation lies in the differing measures of recovery granted in Colorado and Pennsylvania. Colorado's survival statute provides: "All causes of action, except actions for slander or libel, shall survive and may be brought or continued notwithstanding the death of the person in favor of or against whom such action has accrued . . .; and *in tort actions based upon personal injury, the damages recoverable after the death of the person in whose favor such action has accrued shall be limited to loss of earnings and expenses sustained or incurred prior to death, and shall not include damages for pain, suf-*

---

[2] Our Court granted leave to file briefs amici curiae to the parties involved in a number of cases now pending before the United States District Court for the Eastern District of Pennsylvania. These cases, collectively known as the *Barrack* cases, involve suits in tort and contract by the personal representatives of a number of Pennsylvania residents who were killed in the crash of an airliner in Boston on October 4, 1960. Amici curiae also participated in oral argument before our Court.

*fering or disfigurement, nor prospective profits or earnings after date of death. . . ."* Colo. Rev. Stat. Ann. §152-1-9 (Supp. 1960). (Emphasis supplied.)

Under the Pennsylvania survival statute, recovery may be had for the present worth of decedent's likely earnings during the period of his life expectancy, diminished by the probable cost of his own maintenance during the time he would have lived and also by the amount of provision he would have made for the support of his wife and children during the same period. *Skoda v. West Penn Power Co.*, 411 Pa. 323, 335, 191 A. 2d 822, 828-29 (1963).

Since decedent's death was apparently instantaneous, his estate could recover little under Colorado law, but might recover a substantial amount under the law of Pennsylvania.

### III.

We turn now to the first major issue presented by the litigation: whether the action could properly be brought in assumpsit rather than in trespass.[3]

United urges that in The Aeronautical Code of May 25, 1933, P. L. 1001, §406, 2 P.S. §1472, the Pennsylvania Legislature has specifically provided that an action against an air carrier by a passenger for personal injury must, as in other tort claims, be brought in trespass. The Act directs: "The liability of the owner or pilot of an aircraft carrying passengers, for injury or death to such passengers, shall be determined by the rules of law applicable to torts on the lands or waters of this Commonwealth arising out of similar relationships."

---

[3] The court below sustained the institution of the action in assumpsit. In his appeal, plaintiff, of course, does not challenge that ruling. United could not appeal, since the ruling was interlocutory. However, in its argument here, the airline does challenge the propriety of that ruling.

Contrary to United's position, the clear meaning and intention of the statute is that in tort actions for injuries sustained in air disasters, no special rules applicable only to airplanes—but not to torts on land or water—should be utilized. The rules of negligence, e.g., duty, degree of care, burden of proof, liability, remain the same for airplanes as for other carriers. See *Rennekamp v. Blair*, 375 Pa. 620, 628, 101 A. 2d 669, 673 (1954).

In the complaint, plaintiff characterized the contract on which suit was brought as a contract of "safe" carriage. As pointed out by the court below, this reference is inaccurate. It implies an absolute duty which would make the carrier an insurer of the safety of its passengers. Our Court has held that a public carrier owes to its passengers a high degree of care, but it is not an insurer of their safety. *Seburn v. Luzerne & Carbon County Motor Transit Co.*, 394 Pa. 577, 580, 148 A. 2d 534, 536 (1959); see *Sevast v. Lancaster Yellow Cab & Baggage, Inc.*, 413 Pa. 250, 196 A. 2d 842 (1964). Liability may be imposed only for injuries resulting from negligent conduct.[4] Ibid.

The complaint, however, did not limit itself to an allegation of simple breach of contract of safe carriage. The breach is specifically asserted to have been caused by the negligence of United's agents, servants and employees while acting within the course of their employment. Thus, we may conclude that plaintiff is asserting a breach of contract of nonnegligent carriage, rather than merely simple breach of contract of safe carriage.

---

[4] This is distinguished from recovery for damage to goods shipped. Generally, a common carrier of freight is regarded an insurer against loss and bears the burden of showing that the loss was within an exception to the general rule. *Arabian American Oil Co. v. Kirby & Kirby*, 171 Pa. Superior Ct. 23, 90 A. 2d 410 (1952).

Pennsylvania law permits a shipper whose goods have been lost or damaged in transit to maintain either an action in assumpsit for breach of contract or an action in trespass for negligence against the carrier for its breach of duty. *Robinson Electrical Co., Inc. v. Capitol Trucking Corp.,* 168 Pa. Superior Ct. 430, 79 A. 2d 123 (1951). But there is no Pennsylvania authority either for or against a similar election for personal injuries sustained as a result of a carrier's negligence.

One Pennsylvania case involves a somewhat analogous situation. In *M'Call v. Forsyth,* 4 W. & S. 179 (1842), a stagecoach passenger was injured when the coach overturned. Our Court there ruled that plaintiff had a choice of remedies, either assumpsit or trespass on the case.

In *Pittsburgh Rys. v. Givens,* 211 Fed. 885 (3d Cir. 1914), the court of appeals held that the duty of a common carrier to a passenger arises from the contract of carriage, indicating that there was a cause of action in assumpsit for the resulting personal injuries. However, *Givens* was decided prior to *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S. Ct. 817 (1938), which requires application of state law in diversity cases. In the absence of any Pennsylvania citation (or other authority) in the opinion, we cannot conclusively say that Pennsylvania law was being construed and applied.

The rule in New York is that an action may be brought in contract for personal injuries sustained by a passenger, but the action may not be brought in contract if death results. *Kilberg v. Northeast Airlines, Inc.,* 9 N.Y. 2d 34, 172 N.E. 2d 526, 211 N.Y.S. 2d 133 (1961). In Maine also, an action in assumpsit may be brought by a passenger for personal injuries. *Doughty v. Maine Central Transp. Co.,* 141 Me. 124, 39 A. 2d 758 (1944).

As noted in the opinion below, the English rule appears to be that the injured passenger may properly sue in assumpsit or case at his election. *Protheroe v. The Railway Executive,* [1951] 1 K.B. 376; *Taylor v. Manchester Ry.,* [1895] 1 Q.B. 134; *Kelly v. Metropolitan Ry. Co.,* [1895] 1 Q.B. 944.

To summarize: Pennsylvania permits suit against a common carrier for damage to goods to be brought in assumpsit or trespass. There is no binding Pennsylvania authority which would either permit or prohibit such an election where a passenger is injured or killed. Maine permits an election, as does the common law of England. New York allows an election if the passenger is not killed.

We cannot perceive, nor has there been brought to our attention, any compelling reason for Pennsylvania to restrict an injured passenger to an action of trespass while, at the same time, a shipper may elect between trespass and assumpsit for damage to goods. We hold, therefore, that plaintiff may bring a valid action in assumpsit for the alleged negligent breach of contract of carriage which caused the death of plaintiff's decedent.[5]

## IV.

We now address ourselves to the basic choice of law problem. An easy answer is suggested in the argument that the Colorado limitation, by its own terms, is applicable only to tort actions. Since this is a contract action, the argument continues, we need not concern ourselves with the Colorado statute. To so dispose of the issue would be to ignore the realities of the situation. Counsel for plaintiff candidly admitted that this action was brought in assumpsit in order to avoid the effect of the Colorado limitation. Yet the

---

[5] Whether all the benefits and limitations normally attached to an action characterized as assumpsit will automatically apply is not now before us and need not be determined here.

recovery sought is clearly a tort recovery—damages to decedent's estate as a result of decedent's negligently caused death. The principles which will govern defendant's liability are principles of negligence, not of contract, since the action is for negligent breach, not simple breach, of contract. As we indicated above, under the facts before us, an action for simple breach of contract would not and could not justify a substantial recovery by plaintiff. The essentials of this case remain the same regardless of its label. Mere technicalities of pleading should not blind us to the true nature of the action. The choice of law will be the same whether the action is labeled trespass or assumpsit.[6]

In this age of increasingly rapid transit of people and goods, that segment of the law known as conflict of laws, or perhaps more accurately, choice of law, has become more and more significant. In view of this development, it is of utmost importance that our Court re-examine its position in this field of law and make certain that our rules are in harmony with the realities of this age.

### A.

For a great number of years, the rule of this Commonwealth has been that where suit is brought in our courts for personal injuries sustained elsewhere, the substantive rights of the parties are governed by the law of the place of the wrong. See, e.g., *Vant v. Gish,* 412 Pa. 359, 365-66, 194 A. 2d 522, 526 (1963); *Bed-*

---

[6] Had we attempted to pursue the easy solution suggested at the beginning of this discussion, we would examine Colorado law to see if the statute is, in fact, limited to tort actions. No Colorado holding on this issue has been called to our attention, nor has our research disclosed any. Although we cannot say with certainty, in all likelihood, the Colorado court would proceed with an analysis similar to that above and would conclude that the damages sought were, in reality, tort damages, to which the statute would apply regardless of the label placed on the action. We would ultimately be faced with the same choice of law problem.

*narowicz v. Vetrone,* 400 Pa. 385, 162 A. 2d 687 (1960) ; *Rennekamp v. Blair,* 375 Pa. 620, 101 A. 2d 669 (1954) ; *Rodney v. Staman,* 371 Pa. 1, 89 A. 2d 313 (1952) ; *Mike v. Lian,* 322 Pa. 353, 185 Atl. 775 (1936) ; *Barclay v. Thompson,* 2 Pen. & W. 148 (1830). In support of this rule, the more recent cases have placed great reliance on the original Restatement, Conflict of Laws (1934), particularly §378, which states categorically, "The law of the place of wrong determines whether a person has sustained a legal injury." See, e.g., *Bednarowicz v. Vetrone,* supra; *Rennekamp v. Blair,* supra; *Rodney v. Staman,* supra; cf. *Vant v. Gish,* supra.[7]

This place of the injury rule, sometimes termed the lex loci delicti rule, has been the subject of severe criticism in recent years. See, e.g., Restatement (2d), Conflict of Laws, Introductory Note No. 1 (Tent. Draft No. 9, 1964) ;[8] Stumberg, Conflict of Laws 199-212 (3d ed. 1963.) ; Cavers, "A Critique of the Choice-of-Law Problem," 47 Harv. L. Rev. 173 (1933) ; Cheatham & Reese, "Choice of the Applicable Law," 52 Colum. L. Rev. 959 (1952) ; Currie in "Comments on *Babcock v. Jackson,*[9] A Recent Development in Conflict of Laws," 63 Colum. L. Rev. 1212, 1233 (1963) [hereafter "Comments on *Babcock v. Jackson*"] ; Ehrenzweig, "The 'Most Significant Relationship' in the Conflicts Law of Torts," 28 Law & Contemp. Prob. 700 (1963) ; Harper, "Policy Bases of the Conflict of Laws: Reflections on Rereading Professor Lorenzen's

---

[7] It should be noted that the Restatement was cited in *Vant* merely as illustrative of a particular proposition. The opinion observed that the Restatement is in process of revision and that the Restatement (2d), also supported the stated proposition.

[8] Tentative Draft No. 9 was approved by the American Law Institute at their meeting of May 21, 1964.

[9] 12 N.Y. 2d 473, 191 N.E. 2d 279, 240 N.Y.S. 2d 743 (1963). This case will be discussed with other leading cases, infra.

Essays," 56 Yale L.J. 1155 (1947); Morris, "The Proper Law of a Tort," 64 Harv. L. Rev. 881 (1951); Reese in "Comments on *Babcock v. Jackson*," 63 Colum. L. Rev. 1212, 1251 (1963); Traynor, "Is This Conflict Really Necessary?" 37 Texas L. Rev. 657 (1959); and authorities cited in 46 Cornell L.Q. 637, 640 n.20 (1961) and 62 Mich. L. Rev. 1358 n.3 (1964).

The basic theme running through the attacks on the place of the injury rule is that wooden application of a few overly simple rules, based on the outmoded "vested rights theory," cannot solve the complex problems which arise in modern litigation and may often yield harsh, unnecessary and unjust results.[10] See, e. g., Cheatham & Reese, supra; Ehrenzweig, supra; Reese, supra.

### B.

Although the overwhelming majority of writers are opposed to retention of the place of the injury rule, there is disagreement as to the successor to that rule.[11]

---

[10] Professor Stumberg cites *Carter v. Tillery*, 257 S.W. 2d 465 (Civ. App. Tex. 1953), as an extreme example of the unjustness of rigid, unreasoned adherence to the rule. Plaintiff, her husband and defendant, all residents of Texas, were on a flight from New Mexico to El Paso, Texas, in defendant's private plane. The plane strayed off course and landed on a dirt road in Mexico. While attempting to take off, the plane crashed. The Texas forum held that the law of the place of injury, Mexico, applied. Since the Mexican remedy was so dissimilar from that afforded in Texas, the Texas court refused to grant relief and dismissed. Apparently, because all parties were residents of Texas, suit could not have been brought in Mexico. Thus, plaintiff was left without redress. Stumberg, Conflict of Laws 210-211 (3d ed. 1963); Stumberg, " 'The Place of the Wrong'—Torts and the Conflict of Laws," 34 Wash. L. Rev. 388, 399 (1959).

[11] Compare the various approaches and methods suggested in the following: Restatement (2d), Conflict of Laws, Chapter 9 (Tent. Draft No. 9, 1964, approved May 21, 1964); Ehrenzweig, Conflict of Laws (1962); Leflar, Conflict of Laws (1959); Stumberg, Conflict of Laws (3d ed. 1963); Cavers in "Comments on

Professor Currie's approach places great stress on application of the law of the forum where the forum has a legitimate interest in the issue before it. Currie in "Comments on *Babcock v. Jackson*," 63 Colum. L. Rev. 1212, 1233 (1963); Ehrenzweig, Conflict of Laws §122 (1962); Comments, "The Second Conflicts Restatement of Torts: A Caveat," 51 Calif. L. Rev. 762, 779-82 (1963). Professor Ehrenzweig's view, while also stressing the application of forum law, places great emphasis on the interests of the parties, as opposed to governmental interests, particularly whether the defendant could obtain liability insurance adequate under the applicable law and whether the insurer could reasonably calculate the premium. Ehrenzweig in "Comments on *Babcock v. Jackson*," 63 Colum. L. Rev. 1212, 1243 (1963); see Leflar, "Conflict of Laws," 36 N.Y.U.L. Rev. 36, 37 (1961); Comments, "The Second Conflicts Restatement of Torts: A Caveat," 51 Calif. L. Rev. 762, 782-91 (1963); see generally Ehrenzweig, Conflict of Laws (1962).

Other scholars would solve choice of law problems by applying the law of the state having the most sig-

---

*Babcock v. Jackson,*" 63 Colum. L. Rev. 1212, 1219 (1963); Cheatham & Reese, "Choice of the Applicable Law," 52 Colum. L. Rev. 959 (1952); Currie in "Comments on *Babcock v. Jackson*," 63 Colum. L. Rev. 1212, 1233 (1963); Ehrenzweig, "The 'Most Significant Relationship' in the Conflicts Law of Torts," 28 Law. & Contemp. Prob. 700 (1963); Harper, "Policy Bases of the Conflict of Laws: Reflections on Rereading Professor Lorenzen's Essays," 56 Yale L.J. 1155 (1947); Leflar in "Comments on *Babcock v. Jackson*," 63 Colum. L. Rev. 1212, 1247 (1963); Leflar, "Conflict of Laws," 36 N.Y.U.L. Rev. 36 (1961); Reese, "Conflict of Laws and the Restatement Second," 28 Law & Contemp. Prob. 679 (1963); Traynor, "Is This Conflict Really Necessary?" 37 Texas L. Rev. 657 (1959); Weintraub, "A Method for Solving Conflict Problems—Torts," 48 Cornell L.Q. 215 (1963); Comments, "The Second Conflicts Restatement of Torts: A Caveat," 51 Calif. L. Rev. 762 (1963); see generally "Symposium, New Trends in the Conflict of Laws, " 28 Law & Contemp. Prob. 673 (1963).

nificant contacts or relationships with the particular issue. Although they may differ slightly in the manner in which these contacts and relationships are to be evaluated, all place importance upon an analysis of the policies underlying the conflicting laws and of the relationship of the particular contacts to those policies. See Cheatham in "Comments on *Babcock v. Jackson*," 63 Colum. L. Rev. 1212, 1229 (1963); Harper, supra note 11; Leflar in "Comments on *Babcock v. Jackson*," 63 Colum. L. Rev. 1212, 1247 (1963); Reese, "Conflict of Laws and the Restatement Second," 28 Law & Contemp. Prob. 679 (1963); Weintraub, "A Method for Solving Conflict Problems—Torts," 48 Cornell L.Q. 215 (1953).

The position of the Restatement (2d), is that torts should be governed by the local law of the state which has the most significant relationship with the occurrence and the parties, and that separate rules apply to different kinds of torts. Contacts considered vital in determining the state of most significant relationship include place of injury, place of conduct, domicil of the parties, and the place where the relationship between the parties is centered. §379(2). The importance of the respective contacts is determined, in part, by considering the issues, the nature of the tort, and the purposes of the tort rules involved. §379(3). However, §379a of the new Restatement provides: "In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless some other state has a more significant relationship with the occurrence and the parties as to the particular issue involved, in which event the local law of the latter state will govern."

The Restatement (2d) is not without its critics. In urging that the policies which should govern the field of conflicts cannot be set down in simple rules,

Professor Ehrenzweig is as opposed to the new Restatement as he was to the old. See, e.g., Ehrenzweig, "The 'Most Significant Relationship' in the Conflicts Law of Torts," 28 Law & Contemp. Prob. 700 (1963). Professor Currie is concerned that the new Restatement, in effect, has retained the old rule in §379a, quoted above. Currie in "Comments on *Babcock v. Jackson*," 63 Colum. L. Rev. 1212, 1233 (1963). Others are concerned that the Restatement, or the "significant relationship" theory on which it is based, may become nothing more than a contact-counting theory, without analysis of the underlying policy considerations. See Leflar in "Comments on *Babcock v. Jackson*," 63 Colum. L. Rev. 1212, 1247, 1248 (1963); Weintraub, "A Method for Solving Conflict Problems —Torts," 48 Cornell L.Q. 215, 244 (1963); Comments, "The Second Conflicts Restatement of Torts: A Caveat," 51 Calif. L. Rev. 762 (1963). However, as noted earlier, almost all authorities agree that there must be a policy analysis approach to replace the place of the injury rule.

This is not to say that the place of the injury rule is without support. It is argued by some writers that adoption of a more flexible rule does away with certainty in the field of multi-state torts. Sparks, "Babcock v. Jackson—A Practicing Attorney's Reflections upon the Opinion and Its Implications," 31 Ins. Counsel J. 428 (1964). Also, the argument adds, the old rule is much easier to apply and facilitates the task of the attorney in advising his client. See Reese in "Comments on *Babcock v. Jackson*," 63 Colum. L. Rev. 1212, 1251, 1254 (1963). The reply is simply stated. Ease of application and predictability are insufficient reasons to retain an unsound rule. Moreover, if the rule is indeed unsound, courts will create exceptions to it or will attempt to circumvent it. Ibid.

## C.

This brings us to a consideration of some of the leading cases in which the lex loci delicti rule has been avoided or changed.

In *Gordon v. Parker*, 83 F. Supp. 40 (D. Mass. 1949), a Pennsylvania domiciliary brought suit in the Federal District Court of Massachusetts for alienation of his wife's affections by a Massachusetts resident. Pennsylvania, the matrimonial domicil and apparent place of the injury, had abolished such causes of action; Massachusetts had not. The court acknowledged the original position of the Restatement. However, after expressly analyzing the interests and policies of the two states, the court ruled that Massachusetts law governed and denied motion for summary judgment.

*Grant v. McAuliffe*, 41 Cal. 2d 859, 264 P. 2d 944 (1953), involved a collision in Arizona between two California automobiles containing California residents. Arizona law would not permit an action to be commenced after death of the tortfeasor; California imposed no such limitation. In order to avoid application of the lex loci delicti rule, the California court characterized the survival question as a matter of administration of decedents' estates, governed by the law of the forum. Justice TRAYNOR, who wrote the decision, later commented that he did not regard it as ideally articulated, but that on a policy analysis, it did reach the right result, i.e., application of California law. Traynor, "Is This Conflict Really Necessary?" 37 Texas L. Rev. 657, 670 (1959).

In *Schmidt v. Driscoll Hotel, Inc.*, 249 Minn. 376, 82 N.W. 2d 365 (1957), defendant, in Minnesota, illegally sold liquor to an intoxicated person whose automobile was involved in a collision with another Minnesota automobile while in Wisconsin. A Minnesota "dram shop" act imposed liability for the intoxicated

person's conduct upon the tavern-keeper who made the illegal sale; no liability was imposed on the seller under Wisconsin law on these facts. The court observed that should the old Restatement rule apply, the interest of Minnesota in punishing violations of its liquor laws and in providing an injured party with a remedy would be negated. So also would be the Wisconsin interest in affording remedies for injuries in Wisconsin resulting from foreign liquor violations. The court refused to apply the law of the place of the injury. Forum law, that of Minnesota, controlled.

The Supreme Court of Wisconsin, in *Haumschild v. Continental Casualty Co.,* 7 Wis. 2d 130, 95 N.W. 2d 814 (1959), had before it a suit by a Wisconsin wife against her husband for injuries sustained in a motor vehicle collision in California. Under Wisconsin law, a wife may sue her husband in tort; in California, she may not. The court expressly abandoned the original Restatement rule as applied to the facts before it and, in doing so, specifically overruled a long line of cases. The court characterized the issue as one of "family law," not tort law, and applied the law of the domicil, Wisconsin. The caution was expressed, however, that the decision should not be considered as a rejection of the general rule that the law of the place of injury governs the substantive rights of the parties under ordinary circumstances.

*Kilberg v. Northeast Airlines, Inc.,* 9 N.Y. 2d 34, 172 N.E. 2d 526, 211 N.Y.S. 2d 133 (1961), is factually similar to the instant case. A New York passenger who had boarded an airliner in New York City for Boston was killed when the plane crashed in Massachusetts. Suit was brought on the theory of negligent breach of contract of carriage in order to avoid the place of the injury rule and the Massachusetts limitation of $15,000 on wrongful death actions. The court held initially that although New York permits a passenger to sue in con-

tract where he is injured, no such action may be brought where death results. However, in deliberate dictum, the court went on to consider the Massachusetts limitation and its possible application in the wrongful death action which was not then before the court. After concluding that public policy precluded application of the limitation, the court held that measure of damages is a procedural matter to be governed by the law of the forum.

Although the *Kilberg* result is considered to be correct under modern conflicts theory, the manner in which it was reached has not been without adverse comment. See Leflar, "Conflict of Laws," 1961 N.Y.U. Annual Survey of American Law 29, 43-45; Weintraub, "A Method for Solving Conflict Problems—Torts," 48 Cornell L.Q. 215, 244-46 (1963); 46 Cornell L. Q. 637 (1961).

The constitutionality of *Kilberg* was questioned by the defendant airline in *Pearson v. Northeast Airlines, Inc.,* 309 F. 2d 553 (2d Cir. 1962), cert. denied, 372 U.S. 912, 83 S. Ct. 726 (1963), an action by the estate of another passenger in the *Kilberg* crash. The court of appeals, sitting en banc, reversed its own three-judge panel and held that the ruling in *Kilberg* was a proper exercise of the state's power to develop its conflict of law rules. In commenting on the contrary decision of the panel, the court en banc observed: "[T]he inference seemed inescapable that, in effect, the panel majority had exalted the lex loci delictus to constitutional status . . . . If this is indeed the rationale of the panel's opinion, then it is the first decision to 'freeze' into constitutional mandate a choice-of-law rule derived from what may be described as the Ice Age of conflict of laws jurisprudence—at a time when that jurisprudence is in an advanced stage of thaw." Id. at 557. (Footnotes omitted.) Cf. *Clay v. Sun Insurance Office, Ltd.,* 377 U.S. 179, 84 S. Ct. 1197 (1964).

The Supreme Court of the United States has favorably acknowledged the recent tendency of courts to depart from the place of the injury rule in order to take into account the interests of the states having contacts with the issues and the parties. *Richards v. United States*, 369 U.S. 1, 12-13, 82 S. Ct. 585, 592-93 (1962).

The case to which most recent attention has been turned is *Babcock v. Jackson*, 12 N.Y. 2d 473, 191 N.E. 2d 279, 240 N.Y.S. 2d 743 (1963). A New York resident, while a passenger in a New York automobile, was injured in Ontario which prohibits recovery by a guest against a host driver.[12] Writing for a majority of the court, Judge FULD[13] examined the traditional choice of law rule and concluded that its application ignored the valid interests of other jurisdictions, often yielding unjust and anomalous results. He concluded that "justice, fairness and the 'best practical result' . . . may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." Id. at 481, 191 N.E. 2d at 283, 240 N.Y.S. 2d at 749.

Most of the comment on *Babcock* has been favorable. See "Comments on *Babcock v. Jackson*, A Recent Development in Conflict of Laws," 63 Colum. L. Rev. 1212 (1963), in which several of the leading authori-

---

[12] This is substantially similar to *Bednarowicz v. Vetrone*, 400 Pa. 385, 162 A. 2d 687 (1960), in which our Court applied the law of Ontario and dismissed the cause of action. See note 5 supra, and accompanying text.

[13] Judge FULD is also the author of *Auten v. Auten*, 308 N.Y. 155, 124 N.E. 2d 99 (1954), in which New York abandoned the traditional choice of law rules in contracts cases (place of making, place of performance, etc.) in favor of a "center of gravity" or "grouping of contacts" theory.

ties have expressed their views on the decision.[14] But see Ehrenzweig in "Comments on *Babcock v. Jackson*," *supra*, at 1243;[15] Sparks, "Babcock v. Jackson—A Practicing Attorney's Reflections upon the Opinion and Its Implications," 31 Ins. Counsel J. 428 (1964).[16] As Professor Currie observed, "Indeed, the opinion contains items of comfort for almost every critic of the traditional system." Currie in "Comments on *Babcock v. Jackson*," *supra*, at 1234.

In *Lowe's North Wilkesboro Hardware, Inc. v. Fidelity Mutual Life Ins. Co.*, 319 F. 2d 469 (4th Cir. 1963), a North Carolina plaintiff brought an action in that state against a Pennsylvania insurance company for negligent delay in acting upon an application for life insurance. Pennsylvania law, which denied such a cause of action, was applied. The court of appeals so held because Pennsylvania had "the most significant relationships with events constituting the alleged tort and with the parties." Id. at 473. See also *George v. Douglas Aircraft Co., Inc.*, 332 F. 2d 73 (2d Cir. 1964).

## V.

Thus, after careful review and consideration of the leading authorities and cases, we are of the opinion that the strict lex loci delicti rule should be abandoned in Pennsylvania in favor of a more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court.[17] As

---

[14] Professors Cavers, Cheatham, Currie, Ehrenzweig, Leflar and Reese.

[15] See discussion of Ehrenzweig's theory, *supra*, page 14.

[16] See the discussion on the defense of the lex loci delicti rule, *supra*, page 17.

[17] The Uniform Commercial Code, Act of April 6, 1953, P. L. 3, §1-105, as amended, 12A P.S. §1-105 (Supp. 1963), has adopted such an approach. Subsection (1) provides: "Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the par-

said in *Babcock v. Jackson,* supra, 12 N.Y. 2d at 481-82, 191 N.E. 2d at 283, 240 N.Y.S. 2d at 749, "The merit of such a rule is that 'it gives to the place "having the most interest in the problem" paramount control over the legal issues arising out of a particular factual context' and thereby allows the forum to apply 'the policy of the jurisdiction "most intimately concerned with the outcome of [the] particular litigation".' (Auten v. Auten, 308 N.Y. 155, 161, supra.)"

It must be emphasized that this approach to choice of law will not be chaotic and anti-rational. "The alternative to a hard and fast system of doctrinal formulae is not anarchy. The difference is not between a system and no system, but between two systems; between a system which purports to have, but lacks, complete logical symmetry and one which affords latitude for the interplay and clash of conflicting policy factors." Harper, "Policy Bases of the Conflict of Laws: Reflections on Rereading Professor Lorenzen's Essays," 56 Yale L.J. 1155, 1157-58 (1947). Moreover, in evaluating qualitatively the policies underlying the significant relationships to the controversy, our standard will be no less clear than the concepts of "reasonableness" or "due process" which courts have evolved over many years. See Cheatham in "Comments on *Babcock v. Jackson,*" 63 Colum. L. Rev. 1212, 1229, 1230-31 (1963).

We are at the beginning of the development of a workable, fair and flexible approach to choice of law which will become more certain as it is tested and further refined when applied to specific cases before our courts.

---

ties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. *Failing such agreement this Act applies to transactions bearing an appropriate relation to this state.*" (Emphasis supplied.)

We acknowledge that in adopting a new approach in the area of choice of law, of necessity, we overrule our earlier cases based on the lex loci delicti rule. But we must not perpetuate an obsolete rule by blind adherence to the principle of stare decisis. Although adherence to that principle is generally a wise course of judicial action, it does not rigidly command that we follow without deviation earlier pronouncements which are unsuited to modern experience and which no longer adequately serve the interests of justice. Surely, the orderly development of the law must be responsive to new conditions and to the persuasion of superior reasoning. "[W]hen a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. . . . There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years." Cardozo, The Nature of the Judicial Process 150-51 (1921).

## VI.

We now reach the point of application of the new approach to the facts of the instant case. The sole issue to be determined at this stage of the litigation is whether the Colorado limitation of damages is applicable so as to preclude recovery by plaintiff in our courts.

The state in which injury occurred, as such, has relatively little interest in the measure of damages to be recovered unless it can be said with reasonable certainty that defendant acted in reliance on that state's rule. Moreover, where the tort is unintentional, the reliance argument is almost totally untenable. Wein-

traub, "A Method for Solving Conflict Problems—Torts," 48 Cornell L.Q. 215, 220, 227 (1963). This is abundantly clear in the present case; the site of the accident was purely fortuitous.

Ordinarily, the place of the injury may have an interest in the compensation of those who render medical aid and other assistance to the injured party. However, where death is immediate, as on the present facts, that state has no such interest. The absence of Colorado's interest on the specific point is amply illustrated by the statute which limits recovery to damages incurred prior to death.

An examination of the policies which apparently underlie that Colorado statute tends to indicate that state's lack of interest in the amount of recovery in a Pennsylvania court. The limitation would seem to have been intended to prevent Colorado courts from engaging in what they might consider speculative computation of expected earnings and the extremely difficult mathematical reduction to present worth. The statute may be based on procedural considerations of purely local concern. Colorado would be unconcerned if a Pennsylvania forum is willing to engage in such computations. Or, the limitation might have been intended to protect Colorado defendants from large verdicts against them. Although United obviously does some business in Colorado, it is not domiciled there. Furthermore, it does business in and flies over other states, including Pennsylvania, which do not limit recovery. Certainly, United could reasonably anticipate that it might be subject to the laws of such states and could financially protect itself against such eventuality. The element of surprise is lacking.

Pennsylvania's interest in the amount of recovery, on the other hand, is great. The relationship between decedent and United was entered into in Pennsylvania. Our Commonwealth, the domicil of decedent and his

family, is vitally concerned with the administration of decedent's estate and the well-being of the surviving dependents to the extent of granting full recovery, including expected earnings. This policy is so strong that it has been embodied in the Constitution of Pennsylvania, Article III, §21: "The General Assembly may enact laws requiring the payment by employers, or employers and employes jointly, of reasonable compensation for injuries to employes arising in the course of their employment . . .; *but in no other cases shall the General Assembly limit the amount to be recovered for injuries resulting in death, or for injuries to persons or property, and in case of death from such injuries, the right of action shall survive . . . .*" (Emphasis supplied.)

From the foregoing analysis, we conclude that on the complaint before us (the facts of which must be accepted as true on preliminary objections), a valid cause of action in assumpsit has been stated and that the law of Pennsylvania is properly applicable to the issue of damages. Therefore, we must reverse the court below and remand for further proceedings not inconsistent with this opinion.

Reversed and remanded.

———

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

First: I would hold that the Order appealed from is not, as the Court's Opinion states, "an order directing plaintiff to amend"; the Order appealed from is an Order sustaining preliminary objections and dismissing plaintiff's complaint. Since the Order dismissed plaintiff's complaint, it was not an interlocutory but a final Order and was therefore undoubtedly appealable.

Second: I agree with the able opinion of President Judge SLOANE and strongly disagree with the majority Opinion. It substitutes for a clear and definite and

well settled rule with its certainty and stability, a new nebulous and obviously tentative rule which is so indefinite and flexible and is capable of so many different interpretations and applications that it will undoubtedly produce uncertainty, confusion, conflicts between States, and increased litigation.

More particularly, I dissent for each of the following reasons.

(1) The majority Opinion admits that this is an action in assumpsit but then treats it as if it were an action in tort. It is not clear to me (a) how and why assumpsit lies, not for a breach of the contractual warranty of safe carriage, but for the breach through negligence of a contract of carriage or (b) how plaintiff escapes §406 of the Act of May 25, 1933, P. L. 1001, 2 P.S. §1472, *which clearly covers and rules this case.* It provides: "The liability of the owner or pilot of an aircraft carrying passengers for injury or death to such passengers, shall be determined *by the rules of law applicable to torts on the lands*\* or waters of this Commonwealth arising out of similar relationships."

(2) For over 100 years the law of Pennsylvania has been clearly settled, namely, the substantive rights of the parties, as well as the damages recoverable\*\* *are governed by the law of the place of the wrong or as it is sometimes expressed, the law of the place where the injury occurred—lex loci delicti: Vant v. Gish,* 412 Pa. 359, 365-366, 194 A. 2d 522, 526 (1963) ; *Bednarowicz v. Vetrone,* 400 Pa. 385, 162 A. 2d 687 (1960) ; *Rennekamp v. Blair,* 375 Pa. 620, 101 A. 2d 669 (1954) ; *Maxson v. McElhinney,* 370 Pa. 622, 624, 88 A. 2d 747; *Rodney v. Staman,* 371 Pa. 1, 3, 89 A. 2d 313; *Limes v. Keller,* 365 Pa. 258, 74 A. 2d 131; *Randall v. Stager,*

---

\* Italics throughout, ours.

\*\* On this point, see particularly, *Rodney v. Staman,* 371 Pa. 1, 3, 89 A. 2d 313; *Rennekamp v. Blair,* 375 Pa. 620, 101 A. 2d 669,

355 Pa. 352, 354, 49 A. 2d 689; *Mackey v. Robertson,* 328 Pa. 504, 506, 195 A. 870; *Mike v. Lian,* 322 Pa. 353, 185 Atl. 775 (1936); *Dickinson v. Jones,* 309 Pa. 256, 163 Atl. 516 (1932); *Barclay v. Thompson,* 2 Pen. & W. 148 (1830); *Julian v. Tornabene,* 171 Pa. Superior Ct. 333, 90 A. 2d 346.

In the recent case of *Vant v. Gish,* 412 Pa. 359, 194 A. 2d 522 (1963), the Court, speaking through Justice ROBERTS, said (page 365): *"Under the usual and prevailing doctrines of conflict of laws, the situs of a tort is the place of the injury.* See Openbrier v. General Mills, Inc., 340 Pa. 167, 16 A. 2d 379 (1940); Mike v. Lian, 322 Pa. 353, 185 Atl. 775 (1936); Restatement, Conflict of Laws, §377 (1934)."*

Moreover, the rights and liabilities of an airplane owner or carrier are not as new or novel as the majority suddenly discover. We all know that airplanes fly all over the earth, the sea, and the sky, and that airplane flights, take-offs and landings have undoubtedly created new and novel and difficult problems. These problems—including the question of exactly where the injury arose or accident occurred, and what caused it, and what is the appropriate form of action, and the proper forum, and what substantive law should govern, and what is the measure of damages which are recoverable—arose long before 1964 and have existed for approximately a third of a century.

Furthermore, the law of *lex loci delicti* has been applied specifically in a recent case arising from an airplane crash. In *Rennekamp v. Blair,* 375 Pa., supra, a unanimous Court, speaking through Justice, later Chief Justice, JONES, said (pages 621-622): "This action was instituted in the Court of Common Pleas of Allegheny County [Pennsylvania] by the personal

---

* The Restatement in this field is in process of change, but the exact change, or the exact formula, has not yet been finally determined.

representatives of James F. Swain, deceased, to recover damages for his wrongful death in the crash, near Charleston, West Virginia, of a private airplane in which he was a guest passenger. The defendants were the owners of the airplane and procured the pilot's services for Swain's use of the plane on the trip that ended fatally . . . .

"*The substantive rights* of the parties are to be governed by the *lex loci delicti*—in this instance the law of West Virginia: Randall v. Stager, 355 Pa. 352, 49 A. 2d 689; Restatement, Conflict of Laws, §379. Section 5474 of the West Virginia Code confers a right of action for wrongful death enforceable by the decedent's personal representative; section 5475 limits the damages recoverable in such an action to not more than $10,000 . . . .

"The pilot's duty to the passenger was to exercise ordinary care in the circumstances. By statute in this State [Pennsylvania] the liability of an owner or pilot of an aircraft for injury or death to passengers carried is to be *determined according to the law applicable to torts on the lands or waters of the Commonwealth arising out of similar relationships*: Act of May 25, 1933, P. L. 1001, Sec. 406, 2 PS §1472. Swain was admittedly a guest in the plane and not a passenger for hire. Accordingly, the pilot, and by the same token his employers (for the purpose of this case the defendants were the pilot's employers), owed Swain the same degree of care *that an owner or operator of a motor vehicle on land* owes to a gratuitous passenger, that is, the care which a reasonably prudent man would exercise in the same or similar circumstances. Such is the rule generally. See Bruce v. O'Neal Flying Service, Inc., 231 N.C. 181, 185, 56 S.E. 2d 560; Hall v. Payne, supra, p. 144; Schumacher v. Swartz, 68 D. & C. 3, 8; 6 American Jurisprudence, Aviation, §60; Rhyne, Aviation Accident Law, 57-58." (page 628)

The majority Opinion repudiates this long and well settled law (a) even though it was reiterated as recently as October 11, 1963, and (b) even though the law was applied to claims for death resulting from the negligence of the owner of an airplane, and (c) even though the Act of 1933, supra, proscribes the majority's new differential test. Furthermore, the Court's Opinion creates a new test or formula which has *no clear and definite application to many varied factual situations which are certain to arise.*

(3) The majority Opinion demonstrates (a) that it is impossible to formulate at this time a new and different test which can be applied with definiteness and certainty to many varied situations, and (b) it concedes that there is widespread "disagreement among the critics as to the successor to that rule", i.e., lex loci delicti, and that it will likely have to be developed gradually and frequently changed, and (c) that *it is so indefinite and flexible that it will also almost inevitably create instability, uncertainty, confusion and conflict of law throughout our Country, and will undoubtedly greatly increase the volume of litigation* which is already swamping Courts, and thereby further delay speedy Justice. Practically speaking, the only thing certain about the new rule is that plaintiffs will bring their suits in or under the law of the State which allows them to collect the most damages.

Many examples could be given to illustrate and demonstrate the confusion, uncertainty and conflict which the majority's new and flexible formula can and undoubtedly will create, but one will suffice.

Certain friends who are members of a trade association plan to use the same plane in flying to San Francisco to attend a convention. They live respectively in Boston, New York, Philadelphia and Houston. The plane is to commence its flight at Boston, with stops at New York, Philadelphia and Chicago. Those who

live in Boston, New York and Philadelphia buy their tickets and board the plane in their own home towns. The Houstonian buys his ticket in Miami but boards the plane at Chicago. The carrier is a Delaware corporation with its main office in Omaha, Nebraska. Fatal engine trouble develops over Missouri and the plane crashes in Kansas. All four friends are killed.

Under the majority's new formula one may well ask in what Court or Courts suits for damages should be instituted by the families or estates of these four passengers, what State's substantive law would apply and the law of what State would control the measure of damages? Other similar or varied states of fact will undoubtedly arise in the future to plague and vex the Courts and the legal profession. Without a fixed and inflexible rule, the result could be only confusion or chaos, plus an inevitable increase in conflict and litigation.

(4) I fear that the adoption of the majority's new, indefinite and litigation-inviting test, which overrules *Rennekamp v. Blair,* 375 Pa., supra, and distinguishes without any legal distinction or justification *Vant v. Gish,* 412 Pa., supra (decided within less than a year), finally sounds the death knell to the principle of stare decisis which has been, and supposedly still is, a part of the law of Pennsylvania. *Borsch Estate,* 362 Pa. 581, 67 A. 2d 119.

### Stare Decisis—What, Why, Whither?

Stare decisis is a basic, fundamental principle of Law which provides certainty, stability and clarity to the law and enables American citizens, public officials, Congress and legislators alike, to know their powers, rights, limitations and liabilities and to conduct their private lives and to manage their private business and public affairs with certainty. However,—contrary to

what some of its eradicators seem to think—stare decisis is not as fixed and immutable as "The laws of the Medes and Persians", and there are *five recognized exceptions* to this rule which protect and preserve justice in all changing circumstances.

Ever since Lord Coke, Chief Justice of England, enunciated (circa 1600) the famous and until recently the time-honored maxim of the law: "The knowne certaintie of the law is the safetie of all," Stare Decisis has been one of the *bed-rocks* upon which the House of Law has been erected and maintained. This famous maxim has been a beacon light for Anglo-American Courts, for text authorities and for law-abiding Americans ever since the foundation of our Country.

As early as 1953, in *Brown v. Allen,* 344 U.S. 443, Mr. Justice JACKSON (in a concurring opinion on the abuse of the writ of habeas corpus) aptly and pertinently said (page 535) : "Rightly or wrongly, the belief is widely held by the practicing profession that this Court no longer respects impersonal rules of law but is guided in these matters by personal impressions which from time to time may be shared by a majority of Justices. Whatever has been intended, this Court also has generated an impression in much of the judiciary that *regard for precedents and authorities is obsolete,* that *words no longer mean what they have always meant to the profession,* that *the law knows no fixed principles."*

Mr. Justice FRANKFURTER, in his concurring opinion in *Green v. United States,* 356 U.S. 165, 192 (1958), said (page 192) : "To be sure, it is never too late for this court [1] to correct *a misconception in an occasional decision,*[2] *even on a rare occasion* to change a rule of law that may have long persisted but also have long been questioned and *only fluctuatingly applied . . . ."*

I repeat what I said in my concurring opinion in *Michael v. Hahnemann M. C. & Hospital,* 404 Pa. 424, 172 A. 2d 769 (pages 437, 438, 439), and in my dissenting opinion in *Olin Mathieson Chemical Corporation v. White Cross Stores, Inc.,* 414 Pa. 95, 103, 199 A. 2d 266: "In a Constitutional Republican form of Government such as ours, which is based upon law and order, *Certainty and Stability are essential.* Unless the Courts establish and maintain certainty and stability in the law, businessmen cannot safely and wisely make contracts with their employees or with each other; the meaning of wills, bonds, contracts, deeds and leases will fluctuate and change with each change in the personnel of a Court; property interests will be jeopardized and frequently lost or changed; Government cannot adequately protect law-abiding persons or communities against criminals; private citizens will not know their rights and obligations; and public officials will not know from week to week or month to month the powers and limitations of Government. This has been recognized for centuries by English-speaking peoples . . . .

"It is obvious, if we are to progress, that there always will be exceptions to every general rule or principle, and that neither the law nor the principle of stare decisis can or should be as immutable as the laws of the Medes and the Persians. Nevertheless, it is obvious, at least to me, that the principle of stare decisis should not be ignored or extirpated, actually or effectually, because of changes in the personnel of a Court. Mr. Justice FRANFURTER has stated the two exceptions which to him seem justifiable. I agree with him, and while I would express the same thoughts a little differently, I would go further. I would hold that the principle of Stare Decisis should always be applied, *irrespective of the changing personnel of this (or any other Supreme) Court, except in the two situations* set forth

by Justice FRANKFURTER *and in the following situations*: (1) Where the Supreme Court of Pennsylvania is convinced that prior decisions of the Court are irreconcilable, or (2) *the application of a rule or principle has undoubtedly created great confusion;* or (3) in those rare cases where the Supreme Court of Pennsylvania is *convinced* that the reason for the law *undoubtedly no longer exists,* and [change of circumstances or] modern circumstances and Justice combine to require or justify a change, and no one's present personal rights or vested property interests will be injured by the change. Change of circumstances or modern circumstances does not mean, nor has it ever heretofore been considered as the equivalent of 'change of personnel in the Court,' or the substitution of the social or political philosophy of a Judge for the language of the Constitution or of a written instrument, or well settled principles of law."*

Up to the present time the well settled and directly applicable law of *lex loci delicti* has created no uncertainty or confusion in its language or in its application. Furthermore, there are *no new* circumstances, there is *no change* of circumstances, there are no irreconcilable decisions of this Court, the law of *lex loci delicti* has been consistently—not fluctuatingly—applied, there is no convincing reason or any justification for a change in the law of Pennsylvania, especially where the newly formulated rule creates, as we have

---

* The present trend to eliminate stare decisis from our law was foreseen by Justice OWEN J. ROBERTS in 1944 in *Smith v. Allwright*, 321 U.S. 649, when he said (page 669) : "The reason for my concern is that the instant decision, overruling that announced about nine years ago, tends to bring adjudications of this tribunal into the same class as a restricted railroad ticket, good for this day and train only. I have no assurance, in view of current decisions, that the opinion announced today may not shortly be repudiated and overruled by justices who deem they have new light on the subject."

seen, such obvious uncertainty, confusion and likely conflict of laws between the States.

This *Griffith* case does not fall within any of the aforesaid recognized exceptions to the principle of stare decisis.

For each of these reasons I dissent.