Deede **SMITH**

v.

**DEAN WITTER REYNOLDS, INC.**

Civ. A. No. 93–5182.

United States District Court, E.D. Pennsylvania.

March 17, 1994.

---

Frank B. Baldwin, III, Wayne, PA, for plaintiff.

Pauline C. Scalvino, C. Clark Hodgson, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, PA, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KATZ, District Judge.

Following a bench trial, the court makes the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

1. Plaintiff Deede Smith ("Smith") is a citizen of the Commonwealth of Pennsylvania.

2. Defendant Dean Witter Reynolds, Inc. ("Dean Witter") is a Delaware Corporation, with its principal place of business in the state of New York.

3. Dean Witter operates a branch office in Washington, DC (the "Washington Office").

4. Peter A. Horne ("Horne") was an account executive with Dean Witter's Washington Office during the events at issue in the instant action.

5. Ronald Masci ("Masci") is the branch manager of the Washington Office.

6. Jerry Sutch ("Sutch") is the operations manager of the Washington Office.

7. Prior to the summer of 1989, Smith made the acquaintance of Baron Abdul Hakim Al-Warith ("Al-Warith") in connection with potential real estate and petroleum transactions.

8. No pre-July 1989 real estate or petroleum transactions involving Smith and Al-Warith were completed.

9. On or about June 30, 1989, Al-Warith opened an account with the Washington Office in the name of The Al-Warith Group.

10. The Al-Warith Group account was opened with a zero balance.

11. The Al-Warith Group account was held at the Washington Office.

12. In late June of 1989, Smith was invited to participate in a multinational financial

transaction (the "Transaction") with Al–Warith.

13. The Transaction's objective was the acquisition and renovation of a hotel in the Bahamas.

14. The Transaction involved obtaining a sizeable loan from a non-United States financial institution, investing a portion of the loan in financial instruments that would serve the multiple purposes of: (a) collateralizing the loan; (b) payment of the interest and the principal on the loan; (c) financing the acquisition and renovation of the Bahamian hotel; and, (d) paying the fees associated with the Transaction.

15. Dean Witter conditionally agreed to provide financial services for the Transaction including: (a) advice regarding the type of financial instruments that could serve the multiple purposes required by the Transaction; and (b) assistance in purchasing such instruments.

16. Dean Witter required that a "good faith" deposit of $50,000 be placed in a Dean Witter account before it would provide the financial services associated with the Transaction.

17. Dean Witter provided Smith with the information necessary to wire transfer funds to Dean Witter for the benefit of The Al–Warith Group.

18. On July 17, 1989, after discussions with Al–Warith and Horne, Smith agreed to provide the $50,000 "good faith" deposit on the condition that the funds be used only to reimburse Dean Witter for any loss from its participation in the Transaction.

19. Dean Witter responded by indicating its readiness to receive the funds.

20. On July 17, 1989, Smith wired $50,000 to Dean Witter. Smith knew the funds were not being wired to an escrow account.

21. Dean Witter placed the $50,000 wired by Smith in The Al–Warith Group account. It did not matter to Smith that she was wiring the money to The Al–Warith Group account rather than an escrow account.

22. Prior to the wire from Smith, The Al–Warith Group account was unfunded.

23. On July 18, 1989, Al–Warith directed Dean Witter to withdraw $12,500 from The Al–Warith Group account. Dean Witter complied with this request leaving a balance of $37,500 in The Al–Warith Group account.

24. On July 19, 1989, Al–Warith requested that Dean Witter draw a check on The Al–Warith Group account in the amount of $25,000, payable to Societe d'Urbanisme et d'Amenagement.

25. Before complying with Al–Warith's request, Masci had a telephone conversation with Smith on July 19, 1989.

26. During Masci's conversation with Smith, he informed Smith that $12,500 had been withdrawn on the previous day from The Al–Warith Group account at Al–Warith's direction and that Al–Warith was now requesting an additional $25,000 withdrawal from the account.

27. Smith informed Masci that she was aware of Al–Warith activities. In fact, Smith trusted Al–Warith to arrange a $500,000 return on her $50,000 "good faith" investment. The Transaction was a highly speculative venture that never came to fruition. Sutch listened to the conversation on the speaker phone.

28. Smith approved the Al–Warith directed withdrawals.

29. After this conversation with Masci, Smith did not contact Dean Witter again until 1993 when her counsel wrote to the Washington Office.

30. Plaintiff's failure to take any action renders her version of the July 19, 1989 conversation incredible. I credit Masci's and Sutch's version of that conversation.

31. On July 19, 1989, following Masci's conversation with Smith, Dean Witter issued the $25,000 check as directed by Al–Warith.

32. In the six weeks following the July 19, 1989 withdrawal, all but $264 of the $12,500 remaining in The Al–Warith Group account was withdrawn via wire and check at the direction of Al–Warith.

33. Al–Warith directed the withdrawal of more than $49,000 from The Al–Warith Group account.

34. Al–Warith abandoned the Transaction and allowed The Al–Warith Group account to lapse.

35. Plaintiff spoke to Al–Warith in January, 1994 about an aircraft fuel transaction, but she has neither a telephone number nor address for him.

36. Dean Witter did not provide the anticipated financial services for the Transaction.

37. Dean Witter played a passive role in the Al–Warith directed withdrawals form The Al–Warith Group account.

38. Dean Witter received three $12 fees for processing Al–Warith's wire requests.

39. Dean Witter received no other fees in connection with the Transaction.

40. When Horne discussed the good faith deposit with Smith, Dean Witter did not know that it was Al–Warith's intent to either abandon the Transaction or apply the funds withdrawn from The Al–Warith Group account to purposes other than Dean Witter's fees for purchasing the financial instruments necessary to the Transaction.

41. When Masci discussed the $25,000 check with Smith, Dean Witter did not know that it was Al–Warith's intent to either abandon the Transaction or apply the funds withdrawn from The Al–Warith Group account to purposes other than the Transaction.

42. Smith received no compensation for her participation in the Transaction.

43. Smith's contacts with Dean Witter occurred through the Washington Office.

44. The Dean Witter employees Smith dealt with worked in the Washington Office.

45. The instant action was commenced on September 28, 1993.

46. The Commonwealth of Pennsylvania, the District of Columbia and the state of New York all have contacts with the instant action.

47. The District of Columbia's contacts with the instant action include: the main place of contracting, the main place of negotiation of the contract, the main place of intended performance, the main place of the alleged breach and the place of business of Dean Witter involved in this transaction.

48. Pennsylvania's contacts with the instant action include: a place of contracting, a place of negotiation of the contract, the domicil and place of business of Smith and the place where the action is being litigated.

49. New York's contacts with the instant action include: the principal place of business of Dean Witter and a place where the "good faith" funds required by Dean Witter were received.

50. The interests of the District of Columbia in the instant action include its public policy against fraud and breach of contract and the protection of persons doing business within the district.

51. The interests of Pennsylvania in the instant action include its public policy against fraud and breach of contract and the protection of its citizen.

52. The interests of New York in the instant action include its public policy against fraud and breach of contract and the protection of customers of corporations having their principal place of business within the state.

## II.  CONCLUSIONS OF LAW

53. Jurisdiction is based on diversity. 28 U.S.C. § 1332.

54. Pennsylvania's choice of law rules govern the choice of law analysis in this case. *Shields v. Consolidated Rail Corp.,* 810 F.2d 397, 399 (3d Cir.1987) (federal court sitting in a diversity case must apply the choice of law rules of the forum state); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

55. Pennsylvania's choice of law approach combines the Restatement (Second) of Conflicts of Law, commonly known as the most significant relationship test, with interest analysis. *Compagine des Bauxites v. Argonaut–Midwest Ins. Co.,* 880 F.2d 685 (3d Cir.1989) (citing *Griffith v. United Airlines,* 416 Pa. 1, 203 A.2d 796 (1964)); *Blakesley v. Wolford,* 789 F.2d 236 (3d Cir.1986).

56. To determine which jurisdiction's law should be applied, Pennsylvania courts

identify the action's contacts with each of the competing jurisdictions, including the place of contracting, the place of negotiation of the contract, the place of performance, and the domicile of the parties, and then determine the importance of the respective contacts by considering the nature of the claim, the issues and the purposes of the legal rules involved. *Compagine des Bauxites*, 880 F.2d 685, 689–691 (3d Cir.1989); *Griffiths*, 416 Pa. at 15–16, 203 A.2d at 802–803; *American Int'l Underwriters Corp. v. Zurn Industries, Inc.*, 771 F.Supp. 690 (W.D.Pa.1991).

■ 57. The contacts and interests of the District of Columbia and the Commonwealth of Pennsylvania significantly outweigh those of New York. Therefore, Smith's breach of contract and fraud claims should be analyzed under either District of Columbia or Pennsylvania law. *See Compagine des Bauxites*, 880 F.2d at 691.

58. Under the law of the District of Columbia, the statute of limitations for actions on a contract, express or implied, is three years. D.C.Code Ann. § 12–301(7) (1981).

59. Under Pennsylvania law, the statute of limitations for actions on a contract, express or implied, is four years. 42 Pa.C.S.A. § 5525.

60. Because Smith was aware of the alleged breach no later than late July of 1989 and the instant action was not filed until September 28, 1993, Smith's breach of contract claim is time-barred under both District of Columbia and Pennsylvania law and there is no need for the court to choose between the two sovereigns' laws because application of either sovereign's law yields the same result—Smith's contract claim is time-barred. *Coons v. Lawlor*, 804 F.2d 28, 30 (3d Cir.1986) (the court must determine "whether a choice of law must really be made"—if the various laws that might be applied to the case do not differ on the relevant issue, there is a false conflict).

■ 61. The limitations period for instituting a fraud action under District of Columbia law is three years and the limitations period begins at the time the fraud is or reasonably should have been discovered. D.C.Code Ann. § 12–301(8) (1981); *King v.*

*Kitchen Magic, Inc.*, 391 A.2d 1184 (D.C. 1978); *Kropinski v. World Plan Executive Council*, 853 F.2d 948 (D.C.Cir.1988).

■ 62. The limitations period for instituting a fraud action under Pennsylvania law is two years and the limitations period begins at the time the fraud is or reasonably should have been discovered. 42 Pa.C.S. § 5524.

63. Because Smith was aware of the facts and circumstances surrounding Al–Warith's allegedly fraudulent withdrawals no later than the end of July 1989, Smith's fraud claim is time-barred under both District of Columbia and Pennsylvania law. *Coons*, 804 F.2d at 30.

■ 64. Under District of Columbia and Pennsylvania law a written contract may be orally modified or rescinded by a subsequent oral agreement. *Clark v. Clark*, 535 A.2d 872, 876 (D.C.1987); *First Nat. Bank v. Lincoln Nat. Life Ins. Co.*, 824 F.2d 277, 280 (3d Cir.1987).

■ 65. Smith's oral approval of the Al–Warith withdrawals was a modification and waiver of the condition that the $50,000 advance would be applied only to Dean Witter's fees and, consequently, under both Pennsylvania and District of Columbia law, Smith is precluded from suing to enforce the original limitation on the use of the "good faith" advance and her breach of contract claim fails.

66. Because Smith has not proven that Dean Witter made false statements regarding the Transaction nor that Dean Witter otherwise defrauded her, Smith's fraud claim fails.