In the Matter of PENN CENTRAL
TRANSPORTATION COMPANY,
Debtor.

In re COAL SLURRY PIPELINE OF
CONSOLIDATION COAL
COMPANY.

No. 70–347.

United States District Court,
E. D. Pennsylvania.

June 8, 1979.

Thomas M. Kittredge, John B. Rossi, Jr., Philadelphia, Pa., for Penn Central.

William P. Quinn, Philadelphia, Pa., for Norfolk & Western Railway Co. and Wheeling & Lake Erie Co.

Roger Curran, Kirk Vincent, Pittsburgh, Pa., for Consolidation Coal Co. and Continental Oil Co.

W. Charles Hogg, Jr., Mary M. Rogers, Philadelphia, Pa., for Texas Eastern Pipeline Co. and Petrolane, Inc., intervening respondents.

## MEMORANDUM AND ORDER NO. 3971

FULLAM, District Judge.

During the 1950s, Pittsburgh Consolidation Coal Company became interested in building a coal slurry pipeline from its mines and preparation plant at Georgetown, Ohio, to the generating plant of one of its customers, Cleveland Electric Illuminating Company, at Eastlake, Ohio, some 107 miles away. It therefore undertook negotiations with the various railroads whose tracks the pipeline would cross.

There were 13 crossings of railroad rights-of-way involved, 7 owned by Penn Central or its predecessors (6 by Pennsylvania Railroad Company, 1 by New York Central), and 6 by predecessors of the Norfolk & Western. Eventually, the negotiations culminated in a written agreement, dated March 1, 1958, between the coal company, on the one hand, and the various railroads, on the other. Pursuant to this agreement, the railroads granted the necessary crossing permits, the coal company built the pipeline (at a cost of some $12 million) and placed it in operation; and the railroads were assured of certain periodic payments for use of the crossings, and were granted the options discussed below.

Paragraph 2 of the 1958 agreement gave the railroads the right to require the coal company, upon written notice at any time within 10 years after March 1, 1958, to form a new corporation for the purpose of owning and operating the pipeline. In the event such notice was given, the coal company was required immediately to convey the pipeline to the new corporation, and to sell to the railroads a 45% interest in the new corporation, at a price pegged to book value.

Paragraph 5 of the 1958 agreement provides:

"5. So long as one or more of the Railroads is an optionee under this Agreement or is . . . a shareholder in the new corporation, [the coal company] . . . shall not sell the pipeline or its stock in the new corporation without offering the same at book value to the Railroads . . . then owning stock in the new corporation or retaining options hereunder to purchase such stock, and, if [the coal company] . . . elects to sell the pipeline or its stock, one or more of said Railroads . . . shall be entitled to purchase on an equal basis

said pipeline or its stock at the book value of [coal company's] interest therein. . . . ."

Thus, for a period of 10 years from and after March 1, 1958, the railroads had (1) an option to acquire a 45% interest in the pipeline, through the formation of a separate corporation to own and operate the pipeline, and the acquisition of a 45% minority interest therein; (2) the right of first refusal with respect to any proposed sale of the remaining interest in the new corporation formed to own and operate the pipeline; and (3) the right of first refusal with respect to any proposed sale of the pipeline itself. According to the agreement, all of these options were to expire on March 1, 1968.

The various crossing agreements were, by their terms, effective only so long as the pipeline was being used to transport coal. In 1963, after the pipeline had been operating for about five years, the coal company determined to suspend operation of the pipeline. Apparently, implementation by the railroads of the "unit-train" approach to rate-making had made it cheaper to transport coal by railroad than by the slurry pipeline. Accordingly, the parties entered into a First Supplemental Agreement, dated July 31, 1963, modifying the 1958 agreement discussed above. In pertinent part, the 1963 agreement provides that the suspension of operation of the pipeline "shall not constitute an abandonment, cessation, or discontinuance of the use of the pipeline pursuant to said crossing agreements, nor shall such deactivation or suspension adversely affect, modify or terminate the rights of [coal company] or Railroads pursuant to the agreement or said crossing agreements;" and that "the option to exercise

the rights and privileges granted and contained in Paragraphs 2, 3, 4, 5, and 7 of the Agreement . . . may be exercised by the Railroads during the period of suspension and during a period immediately following reactivation of the pipeline equal to that part of the original option period of ten (10) years still remaining at the time the suspension is effected. . . ."

The pipeline has not been operated since August 15, 1963, and, giving effect to the First Supplemental Agreement, the option rights of the railroads have been extended to a date five years after reactivation of the pipeline, if that should ever occur.

In 1966, Pittsburgh Consolidation Coal Company sold all of its assets to a newly created, wholly owned subsidiary of Consolidated Oil Company ("Conoco"); the new owner was named Consolidation Coal Company, and assumed all of Pittsburgh's liabilities as well as its assets.

On August 14, 1975, after extended negotiations, Consolidation Coal Company entered into an "Option and Sales Agreement" purporting to grant to Bill D. Vaught, trading as Vaught Oil Company ("Vaught") an option to purchase the pipeline for $4 million. The railroads were not notified of this proposal, nor were they afforded an opportunity to exercise the option rights conferred by the 1958 and 1963 agreements discussed above. Upon learning of these developments, the railroads promptly protested and, when their protests proved unavailing, instituted the present proceeding to enjoin the proposed sale to Vaught.[1]

I

Two sets of legal issues emerge from the foregoing factual recital: (1) whether the

---

1. The Penn Central Trustees filed a petition, in the reorganization proceeding, seeking injunctive and other relief. Representatives of the other railroads (Norfolk & Western and Wheeling & Lake Erie) filed a similar petition. Responses have been filed by Consolidation and Vaught, and the parties have agreed upon the extensive evidentiary record, and have submitted exhaustive briefs. The case was argued

on September 16, 1976, but has not been disposed of earlier because the parties have been attempting to achieve an amicable settlement, and these efforts have apparently been influenced from time to time by changing economic pressures. The Court has recently been advised that settlement does not seem likely, and that the case should therefore be decided.

railroads still retain valid option rights under the 1958 agreement as modified by the 1963 agreement; and (2) if so, whether those rights may be enforced against these respondents, Consolidation and Vaught. In essence, the respondents contend that the railroads' options are void under the rule against perpetuities, and that, in any event, both Consolidation and Vaught enjoy the status of *bona fide* purchasers for value without notice of the existence of the option arrangements. Because acceptance of the latter argument would render it unnecessary to grapple with the more complex perpetuities issues, I shall first consider the *"bona fide* purchasers" argument.

## II

■ In my judgment, there is no merit whatever in the assertion that Consolidation became a *bona fide* purchaser for value without notice by virtue of its 1966 acquisition of the property from Pittsburgh Consolidation Coal Company. That transaction was not a sale, but a merger, in which Consolidation expressly assumed all of the liabilities of Pittsburgh. Moreover, all of the officers of Pittsburgh Consolidation Coal Company became the officers of Consolidation Coal Company, including the very individuals who had negotiated, and were thoroughly familiar with, both the 1958 and 1963 agreements with the railroads. Thus, even if the 1966 transaction were treated as a sale rather than a merger, it is clear that the 'purchaser' had actual knowledge of the railroads' option rights.

■ With respect to the status of Vaught, the following circumstances are decisive. While the 1958 and 1963 agreements were not recorded, all of the 13 crossing agreements were duly recorded, and at least two of these agreements (the New York Central agreement and the Wheeling agreement) contained express reference to the railroads' option rights.

Throughout the negotiations between Consolidation and Vaught, it was clearly understood by both sides that Vaught intended to use the pipeline for the transmission of natural gas, whereas the various railroad crossing agreements permitted the pipeline to be used only for coal slurry. The 1975 option and sale agreement between Consolidation and Vaught therefore contains the following provisions:

"(C) . . .

"Consol does hereby further covenant and agree to transfer, assign and set over unto Vaught, his heirs, executors, administrators and assigns, all highway permits (101) railroad crossing permits (15) and other legal documents specifically relating to said pipeline.

"Anything herein to the contrary notwithstanding, Consol makes no representation or warranty as to the legal sufficiency or efficacy of said existing easement agreements for purposes of transportation through said pipeline of solids, liquids, gasses and mixtures thereof, or otherwise. Permission is hereinafter granted to Vaught to approach landowners directly for purposes of adapting and upgrading the quality of certain existing easement agreements so as to meet the requirements of Vaught."

Attached to the Option and Sale Agreement is a list of the recorded documents which would be assigned to Vaught; included are all 13 of the recorded railroad crossing agreements.

It is very clear that representatives of the Vaught Company and its associate, Petrolane,[2] thoroughly examined these documents, and were aware that all of the crossing agreements were terminable on 30 days notice if used for anything other than coal slurry.

It is quite apparent, therefore, that Vaught knew that the Option and Sale Agreement, if carried out, would confer no

2. Through a private arrangement, Vaught has assigned some or all of its interests to Petrolane; for purposes of this litigation, the two are synonymous, and it has been agreed that, for the sake of simplicity, Vaught represents the interests of both.

useful right to cross the tracks of the railroads. The most that *can be said* is that, if Vaught had no actual knowledge of the railroads' option rights under the 1958 and 1963 agreements, Vaught might have anticipated a slightly different bargaining posture on the part of the railroads than was actually encountered. Even on that basis, however, it is manifest that Vaught knew it would have to negotiate with the railroads, and that the railroads would be under no obligation to accede to Vaught's desires.

But the truly fatal flaw in Vaught's present argument is the fact that at least two of the crossing agreements which were referred to in the Option and Sale Agreement contained express references to the railroads' option rights. Under any view of the matter, this should have alerted Vaught to the need for further inquiry, and Vaught is therefore chargeable with knowledge of what that inquiry would have disclosed.

I have concluded, therefore, that whatever valid option rights the railroads retain may be enforced against the respondents.

### III

The respondents contend that the railroads' options are void under the Ohio rule against perpetuities then in effect. The railroads argue that Pennsylvania law should be applied; that the options are valid under Pennsylvania law; and that, even if Ohio law is to be applied, the options do not violate the Ohio rule against perpetuities. The conflicts and substantive issues are inter-related, and unusually difficult.

The Pennsylvania rule against perpetuities is a matter of statute. The present statute, 20 Pa.C.S. § 6104 is a verbatim reenactment of statutes which have been in effect since 1947:

"§ 301.4  Rule against perpetuities

"(a) General.—No interest shall be void as a perpetuity except as herein provided.

"(b) Void interest: exceptions.—Upon the expiration of the period allowed by the common law rule against perpetuities

as measured by actual rather than possible events, any interest not then vested and any interest in members of a class the membership of which is then subject to increase shall be void. . . ."

All parties agree that the railroads' options have continuing validity under Pennsylvania law.

The situation is more complicated under the law of Ohio, because of changes in the applicable statute. A 1932 statute, which was in effect when both the 1958 and 1963 agreements were signed, provided:

"No interest in real or personal property shall be good unless it must vest, if at all, not later than [21] years after a life or lives in being at the creation of the interest . . . It is the intention by the adoption of this section to make effective in Ohio what is generally known as the common law against perpetuities." 114 Ohio Laws 320 (1932).

In 1967, this statute was amended by adding to the language quoted above the following:

". . . [E]xcept as set forth in paragraphs (B) and (C) of this section

.    .    .    .    .

"(C) any interest in real or personal property which would violate the rule against perpetuities, under paragraph (A) hereof, shall be reformed, within the limits of the rule, to approximate most closely the intention of the creator of the interest. In determining whether an interest would violate the rule and in reforming an interest the period of perpetuities shall be measured by actual rather than possible events.

"(D) Paragraphs (B) and (C) of this section shall be effective with respect to interests in real or personal property created by wills of decedents dying after December 31, 1967, and with respect to interests in real or personal property created by *inter vivos* instruments executed after December 31, 1967  . . . ." Ohio Revised Code Annot. § 2131.08 (page supplement 1967).

The 1958 agreement granted options for a period of 10 years, and plainly did not involve perpetuities problems. On the other hand, the 1963 modification purported to grant an extension of the options which ran counter to the Ohio statute then in effect; and the rights now being asserted by the railroads are dependent upon the extensions granted in the 1963 agreement.

Under Ohio law, then, the questions include: whether the various option rights each constitute an "interest[s] in real or personal property;" whether each is an "interest[s] in real or personal property created by [an] *inter vivos* instrument executed after December 31, 1967;" and whether the "wait and see" approach embodied in the 1967 statute can properly be applied in the present case. Before reaching these questions, however, it is necessary to address the choice-of-law issues.

### A

■ The choice-of-law rules of Pennsylvania, the forum state, are controlling here. *Klaxon Co. v. Stentor Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) established that principle for diversity cases, and the same rule is applicable in bankruptcy proceedings, insofar as issues of property rights under state law are concerned. *See, e. g., In re Flying W Airways, Inc.,* 341 F.Supp. 26 (E.D.Pa.1972).

Pennsylvania has been in the vanguard of the "most significant contacts" approach, *Griffith v. United Airlines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964), and I have no doubt that its courts would adhere to the elaboration of that approach reflected generally in the *Restatement, Conflict of Laws* (hereinafter "Restatement").

In my view, the significant factors to be taken into account are these: The 1963 agreement with which we are here concerned was negotiated, drafted, and executed (in whole or in substantial part) in Pennsylvania. The principal offices of both Pittsburgh Consolidation Coal Company and the Pennsylvania Railroad, the major participants, were located in Pennsylvania. None of the parties to the agreement was located in a state which then applied the common law rule against perpetuities. Exercise of the ¶2 option would mean the formation of a new corporation, not necessarily in Ohio; and the contemplated transfers of stock interests in the new corporation would also likely occur outside of Ohio (and the situs of the stock itself would presumably be outside of the State of Ohio).[3] On the other hand, the agreement deals with real property located entirely within the State of Ohio. Moreover, the issues to be decided involve the permissible duration of restraints on alienation, matters as to which Ohio plainly has a much greater interest than does Pennsylvania or any other state.

The parties are not entirely in accord as to which section of the Restatement is most pertinent, § 189 governing "contracts for the transfer of interests in land," or § 223, governing "validity and effect of conveyance of interest in land."[4] The choice between these two sections is, in my view, unimportant for present purposes, because of the similarity in their provisions.

Section 189 of the Restatement provides:

"The validity of a contract for the transfer of an interest in land and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the

---

3. The railroads argue that the status of the Penn Central estate as a bankrupt under the jurisdiction of a federal court in Pennsylvania, and the fact that many of its creditors are Pennsylvania-based, should also be considered. I reject that argument. The substantive rights of the parties are not affected by such factors; more specifically, Penn Central's substantive rights cannot have been enhanced by the intervention of bankruptcy.

4. Contrary to some of the arguments of the railroads, I believe § 188 of the Restatement, dealing with contracts in general, has only marginal relevance to this case. In any event, I am satisfied that all three sections point to the same result.

state where the land is situated unless, with respect to the particular issue, some other state has a more significant relationship . . . to the transaction and the parties, in which event the local law of the other state will be applied."

Section 223 of the Restatement provides:

"(1) Whether a conveyance transfers an interest in land and the nature of the interest transferred are determined by the law that would be applied by the courts of the situs.

"(2) These courts would usually apply their own local law in determining such questions."

The comments to these sections suggest two important factors which enter into the balance, in deciding whether this case falls within the "usual" rule (i. e., Ohio law applies) or not. On the one hand, issues concerning the permissible duration of restraints on alienation of real property are preeminently within the sphere of interest of the *situs* state; on the other hand, there is a strong preference for choosing the law which will not void the agreement and frustrate the intention of the parties. Comment (f) to § 223 puts the matter thus:

"Similarly, the courts of the situs would almost invariably apply their own local rule against perpetuities to determine whether an interest sought to be created in the land by the conveyance cannot take effect because the power of alienation is suspended for too long a period. On the other hand, again, these courts might apply the rule against perpetuities of another state in a situation where the land is to be sold and the proceeds transmitted to the other state and the conveyance is valid under the rule against perpetuities of the other state but not under the rule of the situs."

And Comment (d) to § 189 includes the following:

"On occasion, a state which is not the situs of the land will nevertheless, with respect to the particular issue, be the state of most significant relationship to the transaction and the parties and hence the state of the applicable law. This may be so, for example, when the contract would be invalid under the local law of the state where the land is situated but valid under the local law of another state with a close relation to the transaction and the parties. In such a situation, the local law of the other state should be applied unless the value of protecting the expectations of the parties is outweighed in the particular case by the interest of the state where the land is situated in having its invalidating rule applied. . . ."

I think it is reasonably clear that, if the common law rule against perpetuities were still in effect in Ohio, a Pennsylvania court would conclude that Ohio's interest in imposing that rule upon transactions involving Ohio real estate would outweigh the interests of Pennsylvania or any other state in upholding the validity of the transaction and preserving the expectations of the parties to the agreement. But the 1967 amendment to the Ohio statute puts the matter in quite a different light. Now, the interest of Ohio is not that of imposing the common law rule against perpetuities upon all Ohio real estate transactions, but merely such interest as Ohio may have in avoiding retroactive application of reform legislation.

I believe a Pennsylvania court would be justified in concluding that Ohio's interest in non-retroactivity in these circumstances would be minimal. The 1967 statute by its terms is, in effect, retroactive with respect to wills and powers of appointment (that is, the date of death or time of exercise of the power of appointment governs, rather than the date the document was signed). To that extent, at least, retroactivity is constitutionally permissible, since no vested rights are disturbed. *Dollar Savings & Trust Co. v. First National Bank,* 32 Ohio Misc. 81, 285 N.E.2d 768 (1972).

There seems little question that the 1967 amendments were intended to ameliorate

the harshness of the common law perpetuities rule. *See* Paddock, *The Rule Against Perpetuities—Statutory Reform,* 20 Case Western Reserve L.R. 295, 296–97 (1968). No policy of the State of Ohio, let alone a fundamental policy, would be violated by applying a legal rule which is consistent with present Ohio law, and which would only slightly extend the scope of Ohio's own reformation.

I have therefore concluded that a Pennsylvania court, in these circumstances, would apply the Pennsylvania rule against perpetuities, either because Pennsylvania's interest in avoiding invalidity of the agreement and frustration of the intent of the parties is paramount over the limited interest of Ohio in avoiding retroactivity of its reform legislation (applying § 189 of the Restatement); or because the Pennsylvania court concluded that an Ohio court confronted with these circumstances would apply the law of Pennsylvania (§ 223 of the Restatement).[5]

### B

■ Applying the law of Pennsylvania, it is clear that the options granted in the 1958 agreement and extended in the 1963 agreement are not invalid under the rule against perpetuities. The respondents have advanced certain other arguments against the validity of the option agreements, but I find these arguments unpersuasive.

■ Respondents contend that proper application of the doctrine of contract frustration frees the parties from all further liability. Because of changed economic circumstances, the argument runs, the entire purpose of the pipeline, namely, delivery of coal to the Cleveland Electric power plant, is no longer feasible, and the basic intent of all parties to these agreements is now impossible of fulfillment. But use of the pipeline for coal slurry delivery is plainly not an impossibility; the line could be used for its original purpose if its owners wished to do so. In my view, the circumstances of this case simply do not fit the contract-frustration mold. Moreover, there is nothing in the agreements restricting the uses to which the line might be put by the railroads, upon exercise of their options.

■ It has also been suggested, by the intervening respondent Vaught, that by acquiescing in the 1966 transaction whereby Consolidation replaced Pittsburgh Consolidation as the owner of the pipeline, the railroads waived their rights and are estopped from asserting them. Vaught, in my view, has no standing to interpose that objection. But in any event, the argument is without merit. As stated earlier, I regard the 1966 transaction as a merger, rather than a sale; and Consolidation did assume all of the obligations of Pittsburgh under the agreements.

■ Intervening respondent, Vaught, also argues that certain provisions in the 1958 agreement relating to the minimum charge to be exacted for use of the pipeline violated the anti-trust laws, and rendered the entire agreement void. In my opinion, (1) Vaught has no standing to raise the objection; (2) the provision referred to did

---

5. As the discussion in the text implies, I have rejected the railroads' argument that the rule against perpetuities has no application to these agreements. The general rule is that options, including preemptive or "first refusal" options, are governed by the rule against perpetuities. *See Restatement of Property,* §§ 393 and 413; *Quarto Mining Co. v. Litman,* 42 Ohio State 2d 73, 326 N.E.2d 676 (1975); *Barton v. Thaw,* 246 Pa. 348, 92 A. 312 (1914). The significant difference between book value and market value does, in my view, result in a significant restraint on alienation.

While I agree with the railroads' contention that the option to acquire stock in the new corporation is not governed by the rule against perpetuities, the fact remains that that option, standing alone, is of little consequence; the right to require conveyance of the pipeline, either to the new corporation, or to the railroads themselves, *is at the heart of both* ¶¶ 2 and 5 of the agreement, and it is the creation or transfer of that "interest" in real estate which triggers a perpetuities inquiry.

not violate the antitrust laws; and (3) in any event, the option provisions remain enforceable.

I therefore turn to a consideration of the scope of relief to be granted the petitioners.

## IV

The petitioning railroads seek an injunction (1) restraining Consolidation from carrying out the option and sale agreement with Vaught, and (2) requiring Consolidation to tender conveyance of the pipeline to the railroads at book value, pursuant to ¶ 5 of the 1958 agreement. In my view, they are entitled to the former, but not the latter.

■■■ Since the options remain valid, and enforceable against the respondents, the petitioners are plainly entitled to prevent the respondents from violating the 1958 and 1963 agreements by conveying the pipeline to Vaught. That much, at least, flows inevitably from the language of ¶ 5 of the agreement:

> ". . . [Consolidation] shall not sell the pipeline . . . without offering the same at book value to the railroads. . . ."

Petitioners contend, however, that the balance of that sentence now comes into play:

> ". . . and, if [Consolidation] . . . elects to sell the pipeline . . . one or more of said railroads, individually or through wholly owned subsidiaries, shall be entitled to purchase on an equal basis said pipeline or its stock at the book value of [Consolidation's] interest therein. . . ."

That is, the railroads argue that, by entering into the Option and Sale Agreement with Vaught, Consolidation has "elected" to sell the pipeline, and must now offer it to the railroads at the book value price.

While this argument is not entirely lacking in merit, I believe it should be rejected. The agreement itself is silent as to the manner in which such an "election" to sell

was to be manifested, and as to the irreversibility of an election once made.

In order to constitute the corporate act of Consolidation, the election would have to be reflected in a duly adopted resolution of the board of directors. In giving its approval for the proposed Option and Sale Agreement with Vaught, Consolidation's Board resolution authorizes sale of the pipeline, but only at a price of $4 million net to the corporation. Respondents argue that this amounted to a conditional "election" to sell, and that a more generalized, unconditional, decision to sell the pipeline must be shown in order to trigger a present right on the part of the railroads to acquire the pipeline. While there may be merit in this contention, I prefer to rest my conclusion on a more fundamental ground: I believe that, until actual consummation of a sale to third parties, Consolidation has the right to withdraw any election previously made.

There is nothing in the 1958 agreement which mandates treatment of every decision to sell as final and irrevocable. And equitable considerations militate strongly against such a rigid approach in the present circumstances. The parties to the Vaught negotiations were proceeding under a misapprehension as to their legal rights and obligations; fundamental fairness suggests that they should be permitted to re-evaluate the situation after those misunderstandings have been clarified.

An Order will therefore be entered enjoining Consolidation Coal Company from carrying out any sale of the pipeline without first offering it to the petitioners in conformity with ¶ 5 of the 1958 agreement.