J-A08033-17

2017 PA Super 272

| | | |
|---|---|---|
| MELMARK, INC. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALEXANDER SCHUTT, AN | : | No. 2253 EDA 2016 |
| INCAPACITATED PERSON, BY AND | : | |
| THROUGH CLARENCE E. SCHUTT | : | |
| AND BARBARA ROSENTHAL SCHUTT, | : | |
| HIS LEGAL GUARDIANS, AND | : | |
| CLARENCE E. SCHUTT AND BARBARA | : | |
| ROSENTHAL SCHUTT, INDIVIDUALLY | : | |

Appeal from the Judgment Entered June 24, 2016
In the Court of Common Pleas of Delaware County
Civil Division at No(s):  13-01572 Civil Action

BEFORE:   PANELLA, LAZARUS, JJ., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                     **FILED AUGUST 21, 2017**

Appellant, Melmark, Inc. ("Melmark") appeals from the judgment entered in the Court of Common Pleas of Delaware County in Melmark's action raising claims of unjust enrichment and quantum meruit.  We affirm.

This case presents a "choice of law" question bearing on whether New Jersey residents Dr. Clarence Schutt and Barbara Rosenthal Schutt ("the Schutts") are personally liable for the unpaid balance for specialized services rendered to their severely autistic, 31 year-old son, Alexander Schutt

_____

[*] Former Justice specially assigned to the Superior Court.

("Alex"), by Melmark, a Delaware County, Pennsylvania residential care facility assisting individuals with intellectual disabilities and autism. New Jersey's filial support law would shield the Schutts from financial responsibility for Alex's care because they are over age 55 and Alex is no longer a minor. Pennsylvania's filial support law, meanwhile, would provide no age-based exception to parental responsibility to pay for care rendered to an indigent adult child. ***See***, *infra*.

Presiding over Melmark's action against the Schutts, the Court of Common Pleas of Delaware County identified a conflict between the laws and resolved it in favor of the Schutts. Specifically, the court concluded that New Jersey had a greater interest in insulating its elderly parents of adult indigent children from such collection efforts than Pennsylvania had in compelling out-of-state parents to pay an indigent adult child's bill to a private provider.

The attached trial court opinion provides as detailed a factual and procedural history as can be offered, and we need not repeat such detail, herein. Suffice it to say that Dr. and Mrs. Schutt, 71 and 70 years old, respectively, reside in Princeton, New Jersey, and availed themselves of New Jersey public funding to pay for Alex's care at Melmark from 2001 to 2012.

In 2011, however, the New Jersey Department of Developmental Disabilities (NJDDD) did not approve Melmark's rates, and it notified the Schutts that relocation of Alex would soon be necessary. NJDDD offered Alex placement at Bancroft House, in Mullica Hill, New Jersey, but the

Schutts protested about the facility's lack of oxygen systems onsite and its refusal to waive its policy of requiring legal guardians to consent to the use of non-emergency restraints.

NJDDD advised the Schutts that if they did not agree to the transfer, NJDDD would cease payments to Melmark as of March 31, 2012. The Schutts elected against placing Alex at Bancroft and filed an appeal to the New Jersey Office of Administrative Law, which was denied. On March 31, 2012, the Schutts did not take custody of Alex, leaving Melmark to care for him without receiving payment.

On August 27, 2012, the Schutts filed an "Application for Emergent Relief" in New Jersey courts requesting immediate restoration of New Jersey funding for Alex's care at Melmark pending the outcome of the administrative appeal.

Melmark, meanwhile, on July 31, 2012, had filed a Pennsylvania Commitment Petition in Delaware County Court of Common Pleas, Orphans' Court Division, asking the County Mental Health or PA Department of Welfare to take custody of Alex. The Schutts opposed this petition, and argued in open court that a "funding dispute" between Melmark and NJDDD was at the root of this issue, and that their upcoming New Jersey hearing regarding their administrative appeal would resolve the problem.

The Delaware County Orphans' Court sided with the Schutts, as it identified the issue in the case as one involving "a funding dispute between

NJDDD and Melmark . . . that can be resolved at the January 16, 2013 [New Jersey] Appeals Hearing]."

Thereafter, the Schutts voluntarily canceled the upcoming hearing, and in so doing, eliminated any opportunity they alleged was available to obtain payment from NJDDD for Melmark's services to Alex. Because of Alex's increasingly aggressive behaviors, Melmark transported him to a New Jersey crisis center on May 15, 2013.

Therefore, from April 1, 2012, to May 14, 2013, Melmark provided Alex with services without receiving payment. With basic services costing $356.34 per day at seven days a week, and "Adult Day Program" costs of an additional $221.99 per day at five days a week, Alex's total unpaid residential services amounted to $205,236.38.

Melmark filed its Complaint on February 20, 2013 in the Court of Common Pleas of Delaware County. The court denied the parties' cross-motions for summary judgment and set a bench trial date of January 12, 2016. After testimony, trial exhibits, and briefs/memoranda of counsel, the court found in favor of Melmark on its claims against Alex, by and through his parents as legal guardians, as to Count I, Unjust Enrichment, and Count II, Quantum Meruit, in the amount of $205,236.38.

The court, however, found in favor of the Schutts, individually, and against Melmark as to Counts I, Unjust Enrichment, Count II, Quantum Meruit, and Count III, Common Law Duty of Support. Notably, the trial

court applied New Jersey's filial support law to deny Melmark's claims against the parents in this respect.

The trial court relied on several bases to support its decision in favor of the Schutts. Initially, the court noted that the law upon which Melmark's position relied, the Pennsylvania Filial Support Law,[1] directs that "the

---

[1] Section 4603, "**Relatives' liability; procedure**" provides, in pertinent part:

    **(a) Liability.--**

        (1) Except as set forth in paragraph (2), all of the following individuals have the responsibility to care for and maintain or financially assist an indigent person, regardless of whether the indigent person is a public charge:

            (i) The spouse of the indigent person.
            (ii) A child of the indigent person.
            (iii) A parent of the indigent person.

        (2) Paragraph (1) does not apply in any of the following cases:

            (i) If an individual does not have sufficient financial ability to support the indigent person.
            (ii) A child shall not be liable for the support of a parent who abandoned the child and persisted in the abandonment for a period of ten years during the child's minority.

    **(b) Amount.--**

        (1)   Except as set forth in paragraph (2), the amount of liability shall be set by the court in the judicial district in which the indigent person resides.

\*\*\*\*
23 Pa.S.C.A. § 4603.

amount of liability shall be set by the court in the judicial district in which the indigent person resides." 23 Pa.C.S.A. § 4603(b)(1). Because both parties stipulated that Alex was a resident and domiciliary of New Jersey at all times, the court concluded that, even if it were to apply Pennsylvania law to Melmark's claims, Section 4603(b)(1) divested the court of authority to set an amount owed because the court clearly does not exist in the judicial district where the parties agreed Alex resides.

Assuming, *arguendo*, that Section 4603(b)(1) would confer authority upon the court to set the amount due, the court undertook a choice of law analysis pursuant to Pennsylvania precedent, **see** *infra*. The court identified a conflict between Pennsylvania and New Jersey's filial support laws, and it determined that, because New Jersey has the most significant contacts or relationships in the present controversy, New Jersey has the greater interest in the application of its law.

Melmark filed the present appeal and raised the following questions:

DID DELAWARE COUNTY ORPHANS' COURT ERR WHEN IT DETERMINED THAT NEW JERSEY'S FILIAL SUPPORT LAW— INSTEAD OF PENNSYLVANIA'S FILIAL SUPPORT LAW—APPLIED WHEN THIS DISPUTE INVOLVES A FAILURE TO PAY FOR SERVICES PROVIDED BY A PENNSYLVANIA NOT-FOR-PROFIT ORGANIZATION OPERATING IN PENNSYLVANIA?

DID THE COURT ERR WHEN IT FOUND IT LACKED THE ABILITY UNDER THE PENNSYLVANIA FILIAL SUPPORT STATUTE, 23 PA.C.S. § 4603, TO SET THE AMOUNT DUE IN THIS MATTER?

DID THE LOWER COURT ERR IN NOT ENTERING A VERDICT OR JNOV IN FAVOR OF MELMARK UNDER PENNSYLVANIA'S FILIAL SUPPORT LAW?

DID THE LOWER COURT ERR IN NOT ENTERING A VERDICT OR JNOV IN FAVOR OF MELMARK UNDER THE THEORIES OF UNJUST ENRICHMENT AND QUANTUM MERUIT?

Appellant's brief at 3-4.

Melmark contends, first, that the court erred when it applied New Jersey law rather than Pennsylvania law to the question of whether the Schutts were financially liable for all unreimbursed expenses incurred by Melmark in supporting Alex. According to Melmark, New Jersey's filial support law at N.J.S.A. §§ 44:1-139 and 1-140[2] has no application to the

_____

[2] Section 44:1-139, "Obtaining or compelling assistance of relatives," provides:

> Upon application for the relief of a poor person an overseer[1] shall ascertain if possible the relatives chargeable by law for his support and proceed to obtain their assistance or compel them to render such assistance as is provided by law.
>
> [1] Now municipal director of welfare, see N.J.S.A. § 44.1-73.2.

N.J.S.A. § 44:1-139.


Section 44:1-140, "Relatives Chargeable," provides:

> a. The father and mother of a person under 18 years of age who applies for and is eligible to receive public assistance, and the children, and husband or wife, severally and respectively, of a person who applies for and is eligible to receive public assistance, shall, if of sufficient ability, at his or their charge and expense, relieve and maintain the poor person or child in such manner as shall be ordered, after due notice and opportunity to be heard, by any county or municipal director of welfare, or by any court of competent jurisdiction upon its own initiative or the information of any person.

*(Footnote Continued Next Page)*

present matter because the sole purpose of the scheme is to allow New Jersey to seek contribution from family members of an indigent person under 18 years old who is receiving public assistance funds.  Notably, New Jersey was not supplying public assistance funds during the time about which Melmark complains, *i.e.*, April 1, 2012, to May 14, 2013.

Therefore, Melmark maintains, there existed no conflict of law between New Jersey's and Pennsylvania's respective filial support laws, as New Jersey had no interest in the present case, where a Pennsylvania non-profit, alone, was seeking reimbursement.

It is well-settled that a dispute concerning the applicable substantive law compels a choice of law analysis.  **Wilson v. Transport Ins. Co.**, 889 A.2d 563, 571 (Pa.Super. 2005).  "Substantive law is the portion of the law which creates the rights and duties of the parties to a judicial proceeding,

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯

b. The provisions of this section shall apply to the minor children of a mother whose husband shall fail properly to support and maintain such children when by reason thereof they are likely to become a public charge.

c. The provisions of this section shall not apply to any person 55 years of age or over except with regard to his or her spouse, or his or her natural or adopted child under the age of 18 years.

N.J. Stat. Ann. § 44:1-140.

whereas procedural law is the set of rules which prescribe the steps by which the parties may have their respective rights and duties judicially enforced." *Id.* A court conducts the choice of law analysis under the choice of law rules of the forum state. *See Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 21, 203 A.2d 796, 805 (1964).

"The first step in a choice of law analysis under Pennsylvania law is to determine whether a conflict exists between the laws of the competing states." *Budtel Associates, LP v. Continental Cas. Co.*, 915 A.2d 640, 643 (Pa.Super. 2006). "If no conflict exists, further analysis is unnecessary." *Id*. If the court finds a true conflict exists, the court must then decide which state has the greater interest in the application of its law, including which state had the most significant contacts or relationship to the action. *Id*. *See also Troxel v. A.I. DuPont Inst.,* 636 A.2d 1179, 1180-81 (Pa.Super. 1994) (noting relevant inquiry is "the extent to which one state rather than another has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in the application of its rule of law.").

Initially, we address whether the trial court erred in discerning a conflict of law between the Pennsylvania and New Jersey filial support laws. Melmark argues that since the present action did not involve a New Jersey agency attempting to recoup public funds expended for Alex's care, New Jersey's statutory regime has no application in Melmark's action for reimbursement against the Schutts.

While there is no dispute that the entity seeking reimbursement is private rather than public, we disagree with Melmark's position that the New Jersey statutory scheme evinces no purpose to shield elderly parents from collection efforts for services rendered to an adult indigent child who had received public assistance for the majority of his stay with the provider and continues to remain eligible for public assistance.

Implicit in the law's inclusion of age-based limits is the legislative intent to exempt elderly parents such as the Schutts from filial support responsibility for adult indigent children eligible for public assistance. As noted by the trial court, Alex has been the recipient of public assistance, through Medicaid, Social Security Disability benefits, and the NJDDD since 2004. "At all relevant times," the court indicates, "Alex paid and continues to pay most of his Social Security Disability benefits to NJDDD to contribute to the services provided by NJDDD." Trial Court Opinion at 19. Thus, the record establishes that Alex had sought and received public assistance through the state of New Jersey for the majority of the relevant time period, and he remains eligible for New Jersey assistance despite the fact the inability of NJDDD and Melmark to agree on payment terms.

We, therefore, agree with the trial court that the New Jersey statutory scheme reflects a legislative purpose to protect its elderly parents from financial liability associated with the provision of care for their public assistance-eligible indigent adult children under the present circumstances. The purpose is plainly manifest in the language of N.J.S.A. 44:1-140 and is

appropriately put into effect where, as here, elderly parents have depended on New Jersey payments to a private health care provider for many years and where they have made sincere efforts to secure appropriate replacement services once New Jersey and the provider could no longer agree on payment terms.

Having identified such a protective purpose in the New Jersey law distinguishes the present matter from a federal decision upon which Melmark relies. In **_Eades v. Kennedy, PC Law Offices_**, 799 F.3d 161 (2d Cir. 2015), the Second Circuit Court of Appeals found no conflict between the Nursing Home Reform Act (NHRA) and Pennsylvania's indigent support statute because there was "[n]othing in the NHRA indicates that its purpose is to shield family members of nursing home residents from financial responsibility for the residents' medical care[.]" **_Id._** at 172. All provisions of the law, the circuit court observed, pertained to the provision of quality care for nursing home residents.

In contrast, the New Jersey law in question expressly contemplates shielding elderly parents of adult indigent children from support obligations. **_Eades_**, therefore, is inapposite to the present matter, and it offers no support for Melmark's position denying the existence of a conflict between New Jersey's and Pennsylvania's filial support laws. Accordingly, we discern no error with the trial court's opinion recognizing a conflict between the Pennsylvania and New Jersey filial support statutes as applied to the present matter.

Even if a conflict does exist, Melmark argues, it is Pennsylvania that enjoys the stronger interest in having its filial support law applied, as the law was designed to allow Pennsylvania facilities providing care for indigent persons in Pennsylvania to secure payment from responsible family members. This purpose is especially pertinent in the present case, Melmark argues, because the Schutts took legal steps that prolonged Alex's stay in Pennsylvania after NJDDD stopped paying for his expenses.

According to the Schutts, the State of New Jersey has the most significant interest because its relevant statute is a "family law support" law, and the location of one's domicile provides the primary and ultimate reference for the court in deciding choice of law issues. Here, Alex's permanent domicile has always been his family's New Jersey home, making New Jersey "the state with the most central relationship to the family unit." Appellees' brief at 10-11.

These considerations should be controlling, the Schutts maintain, particularly where Melmark wishes to use the Pennsylvania filial support statute as a debt collection tool rather than as a means by which to maintain the continued support of the indigent. It is New Jersey that has the primary responsibility to establish and regulate the support obligations of New Jersey citizens, the Schutts emphasize, such that its interest in this matter would be impaired by application of Pennsylvania filial support law.

Upon conducting a full examination of party briefs, the certified record, and our standard of review pertaining to choice of laws issues, as set forth

above, we find that the trial court's opinion provides a cogent and comprehensive discussion rejecting Melmark's claims and supporting its opinion that New Jersey's interest in the application of its filial support law was paramount. **See** Trial Court Opinion at pp. 18-21. In this regard, the court's opinion subordinates Pennsylvania's interest as one involving not the provision of care for the indigent but, instead, the collection of a private debt for services rendered after New Jersey withdrew funding from a Pennsylvania institution. New Jersey, on the other hand, had an interest in protecting elderly New Jersey parents from caring for their adult child, also a New Jersey resident, consistent with New Jersey law. Finding no abuse of discretion or error of law in the court's assessment, we uphold its decision to apply New Jersey's filial support law to Melmark's claims seeking parental support from the Schutts.

Having determined that the Schutts were under no obligation under New Jersey law to finance Alex's stay at Melmark after NJDDD withdrew funding, it follows that they experienced no personal enrichment during this latter portion of Alex's stay, contrary to Melmark's final claim for *quantum meruit*.

*Quantum meruit* is essentially a claim for unjust enrichment, which "implies a contract [and] requires the defendant to pay to the plaintiff the value of the benefit conferred." **Durst v. Milroy**, *52 A.3d 357, 360* (Pa. Super. 2012). In a *quantum meruit* action, the plaintiff must prove: (1) [the] benefits conferred on defendant by plaintiff; (2) appreciation of such

- 13 -

benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. *See id.* The application of the doctrine depends on the particular factual circumstances of the case at issue. *Schneck v. K.E. David, Ltd.*, 666 A.2d 327, 328 (Pa. Super. 1995).

Again, for the reasons expressed in the trial court's opinion, we uphold the court's determination that Melmark was not entitled to relief under a theory of quantum meruit. As the trial court observed, the Schutts had no legal obligation to care for their adult son, services were not rendered to the Schutts personally, and they never entered into a contract with Melmark in any capacity. Only Alex appreciated the benefits of Melmark's services, the trial court concluded, and it was for that reason that the court entered judgment against Alex, by and through the Schutts in their fiduciary capacities and payable by the estate, and not in their individual capacities.

For the foregoing reasons, judgment is AFFIRMED.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/21/2017

- 14 -

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
CIVIL DIVISION

| | |
|---|---|
| MELMARK, INC. | : 13-001572 |
| | : |
| v. | : |
| | : |
| ALEXANDER SCHUTT, an incapacitated person, | : |
| by and through CLARENCE SCHUTT & | : |
| BARBARA ROSENTHAL SCHUTT | : |
| and | : |
| CLARENCE SCHUTT & | : |
| BARBARA ROSENTHAL SCHUTT, individually | : |

HONORABLE CHRISTINE FIZZANO CANNON  FILED: September 16, 2016

## OPINION

After argument on the Motion for Post-Trial Relief filed by Plaintiff, Melmark, Inc., this Court, on June 2, 2016, entered a final order in this non-jury proceeding that provided as follows, in part: ". . . On Plaintiff's Claim for Unjust Enrichment/Quantum Meruit, this Court finds: a. [i]n favor of Plaintiff, Melmark, Inc., and against Defendant, Alexander Schutt, an incapacitated person, by and through Clarence E. Schutt and Barbara Rosenthal Schutt, his legal guardians, in the amount of $205,236.38. This sum represents residential services from April 1, 2012 through May 14, 2013, for 409 days at $356.34 totaling $145,743.06 ... adult day program for 268 days at $221.99 totaling $59,493.32 ..."; and "... [i]n favor of Defendants, Clarence E. Schutt and Barbara Rosenthal Schutt,

1



individually, and against Plaintiff, Melmark, Inc." Order of the Honorable Christine Fizzano Cannon, filed June 3, 2016. The June 2, 2016 Order further provides that this Court found in favor of "Defendants, Clarence E. Schutt and Barbara Rosenthal Schutt, individually, and against Plaintiff, Melmark, Inc." on Plaintiff's Claim for Statutory and Common Law Duty of Support and for unjust enrichment/quantam meruit. Id. Plaintiff has timely appealed.

The following are joint stipulations of fact entered into the record during the non-jury trial.

1. Alexander Schutt is a severely autistic individual with substantial physical and intellectual disabilities. He engages in a variety of severe maladaptive behaviors including extreme aggression, noncompliance, elopement and PICA. Alex cannot care for himself. During the waking hours, he requires one-to-one assistance with the activities of daily life including toileting, bathing, medication management, recognizing dangerous situations, behavioral issues mobility issues, etc. He is severely intellectually and physically disabled and suffers from grand mal seizures. Melmark has oxygen available on campus in the event that Alex seizes and diastat and oxygen is required to accompany Alex whenever he goes into the community.

2. Melmark Inc. ("Melmark"), is a non-profit corporation incorporated in the State of Delaware. Melmark's primary place of business is located at 2600 Wayland Road, Berwyn, Newtown Township, Delaware County, Pennsylvania 19312. Melmark serves individuals with intellectual disabilities in a residential setting in Newtown Township, Delaware County, Pennsylvania.

3. Alex was born on March 15, 1986 and is 29 years old.

4. At all times, Alex has been a New Jersey resident and domiciliary.

5. Alex's father Clarence Schutt was born on November 20, 1945 and is 70 years old.

6. Alex's mother, Barbara Schutt was born on January 19, 1947 and is 68 years old.

2

7. Clarence and Barbara Schutt are domiciled and reside in the state of New Jersey at 40 Springdale Road, Princeton, NJ.

8. Mr. and Mrs. Schutt were appointed legal guardians of the person of Alexander Schutt on or about August 20, 2004 by the Surrogate's Court in the State of New Jersey.

9. Alex received residential, educational and vocational services at Melmark in Newtown Township, Delaware County, Pennsylvania for approximately thirteen years, from 2001 until May 15, 2013.

10. Alex was placed at Melmark by his local educational agency in New Jersey, the Princeton Regional School District, in 2001.

11. From 2001 to approximately June 2007, Alex received residential and educational services at Melmark which were completely funded by the Princeton Regional School District.

12. Alex has been a recipient of Medicaid and Social Security Disability benefits since approximately 2004.

13. Alex's educational entitlement terminated after he reached the age of 21 in June, 2007.

14. In July 2007, Alex began attending Melmark's adult residential program and received residential and vocational services.

15. The New Jersey Department of Developmental Disabilities ("NJ DDD") is the agency that provides public funding for services and supports that assist New Jersey adults with intellectual and developmental disabilities age 21 and older to live as independently as possible.

16. Melmark provided its residential and vocational services to Alex pursuant to funding through NJ DDD from 2007 through March 31, 2012.

17. At all relevant times from 2007 through the present, Alex has forfeited the majority of his social security disability benefits to NJ DDD as his required contributions to care for the services provided by NJ DDD.

18. In January, 2011, NJ DDD determined that Alex was eligible for Community Care Waiver services. Community Care Waiver is a Federal

3

Medicaid program that reimburses NJ DDD for up to 50% of the cost of these services.

19. At the request of NJ DDD, Melmark created a compliant waiver facility on Melmark's Pennsylvania campus to provide services for Alex.

20. In the spring of 2011, NJ DDD and Melmark began to have a contracting dispute regarding the rates applicable to NJ DDD clients, including Alex Schutt, in residential placements at Melmark.

21. On July 27, 2011, Melmark informed Mr. and Mrs. Schutt that NJ DDD had not approved Melmark's rates and absent a contract at Melmark's current Pennsylvania state and county approved rates, it would be necessary to discharge Alex on Sunday, August 7, 2011. Melmark requested that the Schutts and NJ DDD arrange an alternative placement for Alex no later than August 7, 2011.

22. Through a series of negotiations between Melmark, counsel for the Schutts, and NJ DDD, NJ DDD agreed to several contract extensions through December 31, 2011 to fund Alex's placement at Melmark while it pursued efforts to find alternative appropriate placement for Alex.

23. On December 23, 2011 the NJ DDD offered a New Jersey placement for Alex at the Bancroft facility. On December 30, 2011, New Jersey counsel for the Schutts responded to NJ DDD advising that it had not been determined that the Bancroft program was an appropriate placement for Alex and demanded the continued funding of Alex's current placement at Melmark.

24. On or about January 25, 2012, NJ DDD advised the Schutt's New Jersey counsel that NJ DDD was unable to consider their request for emergent relief and that NJ DDD would agree to extend funding for Alex's placement at Melmark's to allow for transition to an alternative appropriate placement in Alex's home state. The funding was expressly set to terminate on March 31, 2012.

25. On March 12, 2012, NJ DDD sent a letter to the Schutts' counsel stating that:
    A) the prior offer for placement [at Bancroft] would be extended to March 26, 2012, B) if the Schutts did not respond then the offer would be considered rejected, and C) the contract with Melmark for its Pennsylvania service would end on March 31, 2012.

4

26. On March 26, 2012, the Schutts' New Jersey counsel sent a letter to NJ DDD advising that the Schutts could not accept or reject the Bancroft placement for Alex until NJ DDD met both its statutory and regulatory requirements for transferring individuals. The letter also indicated that it was expected that NJ DDD would continue funding Alex's residential placement at Melmark.

27. If called, the Schutts will testify that Bancroft does not have oxygen available onsite as Alex requires.

28. If called, the Schutts will testify that Bancroft did not confirm that it would waive its requirement for the Schutts to consent to non-emergency restraints.

29. NJ DDD sent a letter to Melmark on March 30, 2012 confirming that funding for Alex at Melmark would cease on March 31, 2012. Melmark has not received any payments for Alex's care as of April 1, 2012.

30. Neither NJ DDD nor the Schutts have paid anything to Melmark for the residential and vocational services provided to Alex after March 31, 2012.

31. At no time did Melmark send the Schutts a formal invoice for the residential and vocational services provided to Alex but Melmark made multiple demands to the Schutts for payment of its services by and through the proceedings related the complaint in this matter.

32. On April 1, 2012, and at all times thereafter relevant to this matter, neither the Schutts nor NJ DDD accepted custody of Alex despite repeated requests by Melmark to do so.

33. On or about April 3, 2012, the Schutts appealed NJ DDD's specific offer of placement at the group home in Mullica Hill, NJ operated by Bancroft, as well as NJ DDD's termination of funding at Melmark. The appeal was transferred to the Office of Administrative Law.

34. Melmark continued to provide residential and vocational services to Alex on its Pennsylvania campus at substantial, unreimbursed cost.

35. On June 22, 2012, Melmark's counsel sent a letter to NJ DDD requesting that it find an alternate placement for Alex, pay for Alex's services on Melmark's campus, or accept custody of Alex. Melmark also informed that

agency and the Schutts that it would seek to commit Alex to a Pennsylvania intellectual disability facility if the matter was not resolved.

36. On June 27, 2012, in a letter to Melmark's counsel, NJ DDD responded that it made an offer of placement for Alex which was neither accepted or rejected by the Schutts. NJ DDD deemed the placement rejected and terminated funding for Alex's placement at Melmark as of March 31, 2012. Further, NJ DDD indicated that it would not be a part of any proceedings pursued by Melmark in Pennsylvania.

37. Melmark filed a Pennsylvania Commitment Petition in the Delaware County Court of Common Pleas on July 31, 2012 seeking the Delaware County Mental Health and/or Pennsylvania Department of Welfare to provide residential programming to Alex Schutt. The petition was denied . . .

38. Melmark appealed the denial of its Involuntary Commitment Petition to the Superior Court.

39. On or about August 27, 2012, the Schutts, by and through New Jersey counsel, filed an Application for Emergent Relief requesting the immediate restoration of funding for Alex's placement at Melmark pending the outcome of the administrative appeal currently pending in the New Jersey Office of Administrative Law.

40. NJ DDD denied the Application for Emergent Relief regarding Melmark's funding on September 12, 2012.

41. On or about October 19, 2012, an IHP meeting was conducted via telephone conference between the Schutts, representatives of Melmark, including Alan Arici, and representatives from NJ DDD.

42. Alex is an indigent person. In 2013, Alex received approximately $881.00 per month in Social Security Disability payments.

43. From April 1, 2012 to May 14, 2013, Alex continued to receive residential services at Melmark on its Pennsylvania campus.

44. During the April 1, 2012 through May 14, 2013 time period, the residential services provided to Alex cost $356.34 per day.

45. Melmark's adult day program runs Monday through Friday from 9am until 3pm.

6

46. Alex participated in Melmark's adult day program.

47. During the April 1, 2012 through May 14, 2013 time period, the daily rate for Melmark's adult day program that Alex participated in was $221.99.

48. In 2012, Alex frequently attended riding lessons at Thorncroft Equestrian Center on Friday mornings at 11:00 A.M which were paid for by Mr. and Mrs. Schutt.

49. In 2012, Alex frequently attended speech class at Main Line Speech consultants twice a week which were paid for by Mr. and Mrs. Schutt. All of Alex's off campus speech classes occurred during adult program hours.

50. In 2012, Alex frequently received private art lessons with Deena Bell at the Wayne art center on Tuesdays which were paid for by Mr. and Mrs. Schutt. All of Alex's off campus art lessons occurred during adult program hours.

51. The Schutts traveled frequently to Pennsylvania to visit Alex on the Melmark campus from the period of April 1, 2012 to May 14, 2013.

52. Melmark transferred Alex to a New Jersey crisis center on May 15, 2013.

53. Prior to May 15, 2013, Melmark did research to determine which facilities in New Jersey had crisis centers that could accommodate Alex.

54. Melmark transferred Alex to New Jersey crisis center because Alex was a New Jersey resident.

55. In her deposition, Dr. Joanne Gillis-Donovan, Melmark CEO, stated that: "Our feeling was that if they could get him to a New Jersey crisis center, he could be admitted to a New Jersey agency and that would be ideal because then New Jersey would pick up the cost of his care." See 7/30/14 Deposition of Dr. Joanne Gillis-Donovan p. 58-9.

56. In his deposition, Dr. George Linke, Melmark Executive Vice President and COO, stated that: "So we wanted New Jersey to provide for discharge after the hospital. So it was purposeful that we went to New Jersey, and there is research that we had done to make sure we had a crisis center in New Jersey that could care for him." See 7/30/14 Deposition of Dr. George Linke p. 88.

57. Although Melmark appealed the denial of the Pennsylvania commitment petition to the Superior Court, that Court dismissed the Pennsylvania

7

Appeal on August 23, 2013, as moot because Alex resided in New Jersey and was no longer treated by, or resided at, Melmark.

58. On or about May 22, 2013, NJ DDD determined Alex was in need of an emergency placement because he was deemed homeless. NJ DDD proceeded to seek emergency placement for him and on May 23, 2013, Alexander Schutt was transferred to a residential facility in Franklin Township, New Jersey.

59. Alex currently resides in Bridgewater, New Jersey and continues to receive care and services provided by NJ DDD.

Exhibit J-1.

Plaintiff filed their Complaint in this proceeding on February 20, 2013. After Defendants' Preliminary Objections were overruled, Defendants filed an Answer and New Matter on July 1, 2013. This case was first assigned to the Honorable G. Michael Green, Judge of the Court of Common Pleas of Delaware County, who entered a Trial Assignment and Case Management Order, dated November 4, 2013, and scheduled trial for the April 1, 2014 term. Judge Green extended the trial date for discovery to continue. Melmark filed a Motion for Partial Summary Judgment against Defendants, Clarence E. Schutt and Barbara Schutt, individually, on April 28, 2014, requesting that judgment be entered against them for liability only as to Count III of the Complaint. Defendants filed a timely answer on May 28, 2014 and Plaintiffs filed a sur reply to Defendants' answer on June 18, 2014. Defendants, Clarence E. Schutt and Barbara Rosenthal Schutt, individually, filed a Motion for Partial Summary Judgment as to Count III on August 14, 2014. Melmark timely answered that motion on September 12, 2014. Defendants filed a Petition for Leave to File an Amended Pleading on October 6,

8

2014 requesting the right to file an Amended New Matter to aver that the laws of the State of New Jersey should be applied to the issue of substantive filial support law. Petition for Leave to File Amended Pleading, ¶ 19. Melmark answered the Petition for Leave to Amend on October 27, 2014. On November 24, 2014, Judge Michael Green ordered that this proceeding be reassigned by the Delaware County Civil Court Administrator due to the parties' response to a disclosure and consideration of disqualification pursuant to Pa. Code of Judicial Conduct, Rule 2.11.

This matter was assigned to this Court and argument on the cross motions for partial summary judgment and Defendant's Petition for Leave to File an Amended Pleading was conducted. On April 21, 2015, this Court denied both Plaintiff's and Defendants' motions for summary judgment and granted Defendant's Petition for Leave to File an Amended Pleading within twenty days of the Order. Defendants filed their Amended New Matter on April 30, 2015. This Court entered an Order on December 17, 2015 ruling on certain pre-trial motions and establishing a date certain for trial of January 12, 2016.

At trial, the parties introduced joint stipulations of fact that were admitted by agreement. Exhibit J-1. Plaintiff presented the testimony of Dr. Jessica E. Woods, the executive director of children's services at Melmark. The Defendants did not offer any witnesses. The parties also stipulated to the admission of Exhibit J-2, a 2014 U.S. Form 1040 tax return for Clarence E. Schutt and Barbara Rosenthal Schutt. Plaintiff admitted thirty (30) exhibits into the record, which included:

various correspondence from Plaintiff, the State of New Jersey Department of Human Services, Division of Development Disabilities, and Plaintiff's counsel; a certification by Clarence and Barbara Schutt in proceedings against the State of New Jersey Department of Human Services at Office of Administrative Law docket number HDD 05809-2012 S; a certification of Delyn Byerly, the chief financial officer of Melmark for the New Jersey State proceedings; correspondence from New Jersey counsel for the Defendants; additional communications between Plaintiff and Defendants' counsel; financial records; social security statements; the July 21, 2014 depositions of Clarence Schutt and Barbara Schutt; Defendants' response to Plaintiff's interrogatories; 2008 through 2012 form U.S. 1040 for Clarence E. and Barbara R. Schutt; and an affidavit of Joseph M. Zakrzewski, the vice president and chief financial officer of Melmark, Inc., tabulating the financial cost for services between April 1, 2012 through May 15, 2013.

The Defendants introduced and had admitted into the record exhibits identifying speech classes for their son Alexander at Main Line Speech Consultants between January 2, 2012 through December 13, 2012; attendance records for the Thorncroft Equestrian Center in Malvern, Pennsylvania for January through December 2012; attendance records for the Wayne Art Center for Alexander Schutt for January through December 2012; an accounts receivable invoices and cash receipt report ledgers for Melmark, Inc. between October 31, 2007 through June, 2012; correspondence from Melmark dated

December 12, 2012; email communications between the parties dated April 15, 2013; vocation program attendance sheets for Alex Schutt; Melmark charts; the July 29, 2014 deposition transcript of Jessica Woods; and pages 73, 74 and 75 of the deposition transcript for Delyn Byerly conducted on August 1, 2014.

After review of the testimony, trial exhibits, briefs and memorandum of counsel, this Court entered an Order dated February 19, 2016 finding in favor of Melmark and against Alexander Schutt, an incapacitated person, by and through Clarence E. Schutt and Barbara Rosenthal Schutt, his legal guardians as to Count I and Count II of the Complaint (unjust enrichment/quantam meruit) and finding in favor of the Defendants, Clarence E. Schutt and Barbara Rosenthal Schutt, individually, and against Melmark as to Counts I, II and III of the Complaint (unjust enrichment/quantam meruit and filial support). After receipt of post-trial motions, this Court conducted post-trial argument. The final decree in this proceeding was entered on June 2, 2016.

Plaintiff complains on appeal (verbatim) as follows:

1. On the choice of law issue raised at various points in the proceedings, whether New Jersey's or Pennsylvania's law of filial support applies to this case.

2. Whether the Court erred in denying Plaintiff's Motion for Summary Judgment on Count III of Plaintiff's Complaint (common law and statutory (23 Pa. C.S.A. §4603) duty of filial support) as against Defendants Clarence E. Schutt and Barbara Rosenthal Schutt, individually, where Pennsylvania's filial law support law applies and there were no issues of material fact remaining with regard to Plaintiff's entitlement to relief on these claims, and Plaintiff was entitled to judgment as a matter of law.

3. Whether, following a bench trial, the Court erred in entering a Verdict in favor of Defendants Clarence E. Schutt and Barbara Rosenthal

11

Schutt, individually, and against Plaintiff, on Plaintiff's claim for quantum meruit and unjust enrichment, where Pennsylvania law applies and Plaintiff proved its entitlement to relief on these claims by a preponderance of the evidence.

4. Whether, following a bench trial, the Court erred in entering a Verdict in favor of Defendants Clarence E. Schutt and Barbara Rosenthal Schutt, individually, and against Plaintiff, on Plaintiff's claims under Pennsylvania's common law and statutory (23 Pa. C.S.A. §4603) filial support law, where Pennsylvania's filial support law applies and Plaintiff proved its entitlement to relief on these claims by a preponderance of the evidence.

5. Whether the Court erred in denying Plaintiff's post-trial Motion for Judgment Notwithstanding the Verdict on Plaintiff's claims against Defendants Clarence E. Schutt and Barbara Rosenthal Schutt, individually, under Pennsylvania's common law and statutory (23 Pa. C.S.A. §4603) filial support law, and in failing to amend the Verdict accordingly, where Pennsylvania's filial support law applies and the evidence presented at trial, all relevant and material matters of which was stipulated or was otherwise undisputed, was such that no two reasonable minds could differ that a verdict in the amount of $205, 949.06 (or, in the court's calculation, $205,236.38) should have been entered against these defendants on these claims.

6. Whether the Court erred in denying Plaintiff's post-trial Motion for Judgment Notwithstanding the Verdict on Plaintiff's claims against Defendants Clarence E. Schutt and Barbara Rosenthal Schutt, individually, for quantam meruit and unjust enrichment, and in failing to amend the Verdict accordingly, where Pennsylvania law applies and the evidence presented at trial, all relevant and material matters of which was stipulated or was otherwise undisputed, was such that no two reasonable minds could differ that a verdict in the amount of $205,949.06 (or, in the court's calculation, $205,236.38) should have been entered against these defendants on these claims.

7. Whether the Court erred in failing to grant Plaintiff's Motion for a New Trial on Plaintiff's claims against Defendants Clarence E. Schutt and Barbara Rosenthal Schutt, individually, as the Verdict was against the weight of the evidence.

Plaintiff's Statement of Matters Complained of on Appeal, filed August 11, 2016.

The Plaintiff complains that this Court erred when it denied the Plaintiff's

Motion for Partial Summary Judgment. The Plaintiff's Motion for Partial Summary

12

requested judgment on Count III of Plaintiff's Complaint in favor of Defendant, Clarence E. Schutt and Barbara Rosenthal Schutt, personally, pursuant to 23 Pa.C.S.A. § 4603. While this Court did not ultimately adopt the reasoning of the Plaintiff as to choice of law in this case, there were outstanding genuine issues of material fact that had to be determined before the choice of law issue could be decided in favor of one side or another. The choice of law issue had been raised in response to the Plaintiff's Motion for Partial Summary Judgment and a Petition for Leave to File Amended Pleading was pending before this Court, requesting an amendment to new matter to aver reliance on a New Jersey filial support law, at the time that argument was held on the Plaintiff's Motion for Partial Summary Judgment. Defendant's Petition for Leave to File Amended Pleading was granted on April 2, 2015, the same day the Plaintiff's Motion for Partial Summary Judgment was denied. Specifically, those facts that would have allowed this court to conduct a choice of law analysis were in dispute at the time the Motion for Partial Summary Judgment was heard. *See* discussion, *infra*, pp 19-21. Also in dispute, even if this Court had decided at the time the Plaintiff's Motion for Summary Judgment was heard to apply Pennsylvania law, was the financial ability of the Schutt's to support Alexander. Many issues of material fact were later resolved when a Joint Stipulation of the parties was submitted to the Court at the non-jury trial and made part of the record. *See* Exhibit J-1.

The Plaintiff in this matter claims that Clarence E. Schutt and Barbara Rosenthal Schutt are personally liable for the services provided to their adult

indigent son Alexander Schutt at Melmark from April 1, 2012 through May 14, 2013. Plaintiff's Complaint, Count III. Count III of Plaintiff's Complaint alleged that such personal liability was appropriate under 23 Pa.C.S.A. § 4603 (hereinafter the "Pennsylvania Filial Support Law"). Id.

Section 4603 provides:

**(a) Liability.--**
(1) Except as set forth in paragraph (2), all of the following individuals have the responsibility to care for and maintain or financially assist an indigent person, regardless of whether the indigent person is a public charge:
(i) The spouse of the indigent person.
(ii) A child of the indigent person.
(iii) A parent of the indigent person.
(2) Paragraph (1) does not apply in any of the following cases:
(i) If an individual does not have sufficient financial ability to support the indigent person.
(ii) A child shall not be liable for the support of a parent who abandoned the child and persisted in the abandonment for a period of ten years during the child's minority.

**(b) Amount.--**
(1) Except as set forth in paragraph (2), the amount of liability shall be set by the court in the judicial district in which the indigent person resides.
(2) For medical assistance for the aged other than public nursing home care, as provided in section 401 of the act of June 13, 1967 (P.L. 31, No. 21),[1] known as the Public Welfare Code, the following apply:
(i) Except as set forth in subparagraph (ii), the amount of liability shall, during any 12-month period, be the lesser of:
(A) six times the excess of the liable individual's average monthly income over the amount required for the reasonable support of the liable individual and other persons dependent upon the liable individual; or
(B) the cost of the medical assistance for the aged.
(ii) The department may, by reasonable regulations, adjust the liability under subparagraph (i), including complete elimination of the liability, at a cost to the Commonwealth not exceeding those funds certified by the Secretary of the Budget as available for this purpose.

14

**(c) Procedure.**--A court has jurisdiction in a case under this section upon petition of:

> (1) an indigent person; or
> (2) any other person or public body or public agency having any interest in the care, maintenance or assistance of such indigent person.

**(d) Contempt.**--

> (1) If an individual liable for support under this section fails to comply with an order under this section, the court shall schedule a contempt hearing. At the hearing, if the court determines that the individual liable for support has intentionally failed to comply with the order, the court may hold the individual in contempt of court and may sentence the individual to up to six months' imprisonment.
> (2) This subsection applies regardless of whether the indigent person is confined in a public institution.

23 Pa.C.S.A. § 4603.

First, the Pennsylvania Filial Support Law indicates that the amount owed will be set by the judicial district in the state where the indigent person resides. 23 Pa.C.S.A. §4603(b)(1). The joint trial stipulations of the parties in this matter indicate that "[a]t all times, Alex has been a New Jersey resident and domicilary." Exhibit J-1, ¶ 4. As the parties to this action do not dispute that Alexander Schutt was a "resident" of New Jersey "at all times," this Court does not have the ability to set an amount owed pursuant to Section 4603 as this Court does not exist in the judicial district where the indigent person, Alexander Schutt, resides.

Assuming, arguendo, that this Court can set the amount due, this Court undertook a choice of law analysis. *See* Sheard v. J.J. Deluca Co., Inc., 92 A.3d 68, 76 (Pa. Super. 2014) (*citing* Wilson v. Transport Ins. Co., 889 A.2d 563, 571 (Pa. Super. 2005)). First this Court examined whether a conflict exists between the Pennsylvania and the New Jersey law regarding relatives' liability for support

15

of an indigent person. Id. (citing Budtel Associates, LP v. Continental Casual Company, 915 A.2d 640, 643 (Pa. Super. 2006)).

The New Jersey law regarding relatives liability for support, N.J.S.A. 44:1-139 and 44:1-140 (hereinafter "New Jersey Filial Support Law"), provides that "[u]pon application for the relief of a poor person an overseer[1] shall ascertain if possible the relatives chargeable by law for his support and proceed to obtain their assistance or compel them to render such assistance as is provided by law." N.J.S.A. 44:1-139. The New Jersey law notes that relatives chargeable for support include:

> a. **The father and mother of a person under 18 years of age** who applies for and is eligible to receive public assistance, and the children, and husband or wife, severally and respectively, of a person who applies for and is eligible to receive public assistance, shall, if of sufficient ability, at his or their charge and expense, relieve and maintain the poor person or child in such manner as shall be ordered, after due notice and opportunity to be heard, by any county or municipal director of welfare, or by any court of competent jurisdiction upon its own initiative or the information of any person.
> b. The provisions of this section shall apply to the minor children of a mother whose husband shall fail properly to support and maintain such children when by reason thereof they are likely to become a public charge.

N.J.S.A. 44:1-140(a) and (b) (emphasis added).

However, "[t]he provisions of [the above] section **shall not apply to any person 55 years of age or over** except with regard to his or her spouse, or his or her natural or adopted child under the age of 18 years. N.J.S.A. 44:1-140 (c). (emphasis added). While both the Pennsylvania and New Jersey laws seek to have parents support, relieve and maintain their indigent children, the New Jersey statute only allows liability for parents under 55 to maintain/support

16

indigent children under the age of 18 as may be ordered. At all relevant times, Mr. and Mrs. Schutt have been over the age of 55 years of age and Alexander Schutt has been over 18 years of age. Alexander Schutt is 29 years old. Exhibit J-1 at ¶ 3. Clarence E. Schutt and Barbara Rosenthal Schutt are 70 years old and 68 years old, respectively. Id. at ¶¶ 5 and 6. The Pennsylvania statute requires support by parents of an indigent child without regard to the parents' age or the child's age. A conflict exists. The application of the Pennsylvania law would mean that a New Jersey resident could be held liable to support an indigent child for whom they would not be responsible under the New Jersey law.

Pennsylvania Courts apply the analysis set forth in the Griffith rule and the Restatement (Second) Conflict of Laws regarding choice of law principles. *See* Griffith v. United Air Lines, Inc., 203 A.2d 796, 801-807 (Pa. 1964); Gillan v. Gillan, 345 A.2d 742, 744 (Pa. Super. 1975). Specifically, Section 6 of the Restatement (Second) Conflict of Laws provides that:

1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

   (a) the needs of the interstate and international systems,
   (b) the relevant policies of the forum,
   (c) the relevant policies of other interested states and the relative interests in those states in the determination of the particular issue,
   (d) the protection of justified expectations,
   (e) the basic policies underlying the particular field of law,
   (f) certainty, predictability and uniformity of result, and
   (g) ease in the determination and application of the law to be applied.

Restatement (Second) Conflict of Laws § 6; *See* Gillian at 744.

A choice of law inquiry includes an "analysis of the policies and interests underlying the particular issue before the court." Commonwealth v. Sanchez, 716 A.2d 1221, 1223-24 (*citing* Griffith v. United Airlines, Inc., 203 A.2d 796, 805 (Pa. 1964)). "This approach gives the state having the most interest in the question paramount control over the legal issues arising from a particular factual context thereby allowing the forum to apply the policy of the jurisdiction most intimately concerned with the outcome." Id. This Court examined which state has the most quantitative and qualitative contacts with the controversy at issue. *See* Miller v. Gay, 470 A.2d 1353, 1355 (Pa. Super. 1983).

In light of the conflict between the Pennsylvania and New Jersey laws in this matter, this Court followed the *Griffith* rule and examined the factors stated in Section 6 to determine "which state has the greater interest in the application of its law". Budtel Associates, LP v. Continental Casualty Co., 915 A.2d 640, 643 (Pa. Super. 2006); *See* Griffith, at 203 A.2d at 801-807; Gillan, at 744. In weighing the competing interests of Pennsylvania and New Jersey this Court analyzed "which state had the most significant contacts or relationships. Gillan, at 744.

New Jersey's interest would be impaired by the application of the Pennsylvania rule as the Pennsylvania rule would have elderly New Jersey residents held liable for the support and maintenance of an adult indigent child (also a resident of New Jersey) who was provided services in a Pennsylvania institution. The State of New Jersey is certainly concerned with the responsibility

18

of support of its indigent residents and concerned with holding parents responsible when appropriate under its state's laws, but the New Jersey law also has interest in protecting elderly parents from caring for adult children. While the Pennsylvania law contemplates support of indigent adult children by elderly parents, Pennsylvania's interest in this litigation is not the care of the indigent child, as the child receives services from NJ DDD to whom he pays his SSD benefits. The interest of Pennsylvania in this litigation is to see that a Pennsylvania private institution is paid for services rendered after a New Jersey public funding agency has decided to withdrawal funding to that institution for the care of a New Jersey resident.

This Court considered the following to indicate a greater interest of the State of New Jersey in applying its law in this case. Alexander Schutt is an indigent person. Exhibit J-1, ¶ 42. He receives public assistance having received Medicaid and Social Security Disability benefits since approximately 2004. Id. at ¶ 12. The New Jersey Department of Developmental Disabilities (NJ DDD) provided public funding to Alexander Schutt so that he could receive services from Melmark. Id. at ¶¶ 15 and 16. At all relevant times, Alex paid and continues to pay most of his Social Security Disability benefits to NJ DDD to contribute to the services provided by NJ DDD. Id. at ¶ 17.

Alexander Schutt's parents have been and continue to be residents of New Jersey. Exhibit J-1, ¶ 3, 4 and 7. "At all times, Alex has been a New Jersey resident and domiciliary". Id. at ¶ 4. Mr. and Mrs. Schutt were appointed the

19

guardians of Alexander Schutt's person and estate by the Surrogate's Court of the State of New Jersey in 2004. Id. at ¶ 8; Plaintiff's Exhibit P-11.

Alex was placed at Melmark by his local New Jersey educational agency in New Jersey, the Princeton Regional School District, in 2001. Id. at ¶10. Alex received residential and educational services at Melmark from 2001 to 2007 which "were completely funded by New Jersey's Princeton Regional School District." Id. at 11. The NJ DDD "provides public funding for services and supports that assist New Jersey adults with intellectual and developmental disabilities age 21 and older to live as independently as possible." Id. at 15. "Melmark provided its residential and vocational services to Alex pursuant to funding through NJ DDD from 2007 through March 31, 2012." Id. at ¶16. A funding dispute developed between NJ DDD and Melmark for Alex's service. Id. ¶¶ 18-30. At all relevant times from 2007 through the present, Alex paid the majority of his Social Security Disability benefits to NJ DDD as his required contributions to care for the services provided by NJ DDD. Id. at ¶ 17. At no time during his over twelve year stay at Melmark were Mr. and Mrs. Schutt responsible to pay and/or contribute to the cost of Alex's care at Melmark. Id. at ¶31. At no time did Mr. and Mrs. Schutt pay for services provided by Melmark or agree to pay for services provided by Melmark. The Schutts did not sign a contract with Melmark as Alex's parents or as Alex's guardians. They did not select Melmark as the facility for their son and they did not decide to remove their son from the facility. Id. at ¶ 11. Melmark returned Alex to New Jersey in

20

May 2013 because Alex was a New Jersey resident. Id. at ¶ 52-56. The only real contact that the Schutts seemed to have in Pennsylvania, outside of visiting their son at the Melmark facility, was paying for horseback riding, speech class and art lessons for their son outside of the Melmark facility. Exhibit J-1, ¶¶ 48-51. As such, this Court found that the quantity and quality of contracts and significant relations to this matter are with the State of New Jersey. Accordingly, this Court applied New Jersey law and found Count III of the Plaintiff's Complaint without merit.

As stated, this Court did not find Mr. and Mrs. Schutt personally liable for the services provided to Alexander Schutt under the support statute, and, as such, the Schutt's had no personal responsibility to pay for the services that were rendered to Alexander at Melmark. In addition, this Court found that the Schutts were not personally, individually, unjustly enriched. "A cause of action in quasi-contract for quantam meruit, a form of restitution, is made out where one person has been unjustly enriched at the expense of another." Mitchell v. Moore, 729 A.2d 1200, 1202, fn. 2 (Pa. Super. 1999). The claim for quantum meruit or unjust enrichment must establish that there are "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." AmeriPro Search, Inc. v. Fleming Steel Co., 787 A.2d 988, 991 (Pa. Super. 2001) (citation omitted). This Court finds that any benefit conferred by Melmark was appreciated by

21

Alexander Schutt, by and through his legal guardians, not by his parents who individually and personally did not receive the benefit as they had no legal obligation to pay for services rendered to their son and no legal obligation to support him after he turned 18 years of age and/or after they turned 55 years of age.

The Schutts had no legal obligation to care for their son in their individual capacity as his parents. Services were not provided to the Schutts personally. Rather, Alexander Schutt was a 29 year old person who was under the care and control of his two guardians. His parents were appointed the guardians of Alexander's estate and person in New Jersey in 2004, the year Alexander turned 18. Exhibit J-1; Exhibit P-11. While the Schutts never entered into a contract with Melmark, as guardians, any such claim on a contract entered into by the guardian of Alexander Schutt would find fiduciaries liable only in their fiduciary capacity and any judgment obtained on such a contract would be proper against the estate, not against the guardians personally. *See* 20 Pa.C.S.A. Section 3331.

This Court found that there were "benefits conferred" on Alexander Schutt, by and through Clarence E. Schutt and Barbara Rosenthal Schutt, his legal guardians, by Melmark, "appreciation of such benefits" by Alexander Schutt, and "acceptance and retention of such benefits under such circumstances that it would be inequitable" for Alexander Schutt to "retain the benefit without payment of value." AmeriPro Search, Inc. v. Fleming Steel Co., 787 A.2d at 991. This Court did find that services were provided to Alexander Schutt for the period

of time stated in the joint stipulation and this Court calculated the damages, the amount owed by Alexander Schutt, by and through his legal guardians, in accordance with the rates stated in the joint stipulation as follows:

. . . In the amount of $205,236.38 for residential services from April 1, 2012 through May 14, 2013, for 409 days at $365.34 totaling $145,743.06 and adult day program for 268 days at $221.99 totaling $59,593.32. Exhibit P-29, J-1, paragraphs 44 and 47, Order of June 2, 2016, paragraph 2(a).

BY THE COURT:

CHRISTINE FIZZANO CANNON, J.

2016 SEP 19 PH 2:18
OFFICE OF JUDICIAL SUPPORT DELAWARE CO. PA.
FILED JM

23